946 So.2d 133 (2006)
John LAM, a Minor, Through Thom LAM in His Capacity as the Administrator of the Estate of His Minor Child, John Lam
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Thomas Perino, Mildred Perino, Individually and as the Administrator of the Estate of Thomas Perino, Salvador Perino Individually and as the Administrator of the Estate of Thomas Perino, et al.
No. 2005-C-1139.
Supreme Court of Louisiana.
November 29, 2006.
Rehearing Denied February 2, 2007.
*134 Peuler & Ernst, Gregory L. Ernst, John B. Peuler, Anthony D'Alto II, New Orleans; Clayton Law Firm, Antonio M. Clayton; Shows, Cali & Berthelot, E. Wade Shows, Sheri M. Morris, Baton Rouge, for Applicant.
Evans & Clesi, Sheryl M. Howard, Anthony J. Clesi, Jr., Kenneth R. Evans, H. James Parker, New Orleans, Derek M. Mercadal; Gainsburg, Benjamin, David, Meunier & Warshauer, Gerald E. Meunier, New Orleans; Gauthier, Houghtaling & Williams, Edward F. Downing, III, John W. Houghtaling, II, Metairie; George H. Troxell, III; Ungarino & Eckert, William H. Eckert, Metairie, Richard C. Bates, Harvey, for Respondent.
TRAYLOR, Justice.
We granted this writ application to determine whether the court of appeal erred in reversing the judgment of the trial court in part and affirming the judgment in part. For the reasons which follow, we reverse the ruling of the Court of Appeal in part and affirm in part.

FACTS and PROCEDURAL HISTORY
On the evening of January 31, 1995, Hue Nguyen Lam, the wife of Thom Lam, was driving a Nissan Maxima eastbound on the elevated Westbank Expressway in Jefferson Parish. In the car with her were her husband, Thom, and her two sons, John and Henry. The Lams were following, by design, a 1989 Toyota Supra owned by Dinh Nguyen and driven by Billy Nguyen, Dinh's brother, when the Supra lost power and began to slow down. Sometime later, a Ford pickup truck driven by Thomas Perino, a minor, struck the rear of the Lam vehicle, projecting it forward into the rear of the Nguyen vehicle. As a result of the accident, two-year old John Lam was rendered a paraplegic.
*135 On March 21, 1995, the Lams filed suit against Salvador Perino, individually and on behalf of his minor son, Thomas, Billy Nguyen, Dinh Nguyen, and State Farm Mutual Automobile Insurance Company alleging fault among the various parties. On December 23, 1996, the Lams filed a supplemental and amended petition, alleging that Lakeside Toyota had been negligent in repairing the Toyota Supra driven by Billy Nguyen on January 12, 1994, more than a year prior to the accident.
At trial, Lakeside presented a model ignition system to the jury and had an expert testify as to the model. The jury found that Thomas Perino was twenty-five percent at fault for the accident, Hue Nguyen Lam was seventeen and one half percent at fault, Billy Nguyen was forty percent at fault, Thom Lam was seventeen and one half percent at fault, and Lakeside Toyota was without fault. The jury's total award was $7,103,235.00.
Following the Lam's appeal, the Court of Appeal reversed the assignments of fault as to Thom Lam and Lakeside Toyota. Lam v. State Farm Mutual Automobile Ins. Co., XXXX-XXXX (La.App. 4th Cir.4/1/2005), 901 So.2d 559. The Court of Appeal found that the jury was charged with the incorrect law with respect to Thom Lam's fault for the accident and/or injuries, and that the trial court had erroneously allowed the admission of Lakeside's model ignition system and the testimony of Lakeside's expert as to the model. In other words, the Court of Appeal found that the jury was presented with inadmissible evidence on the issue of Lakeside's fault. After de novo review, the Court of Appeal found that Thom Lam was without fault and that Lakeside was seventeen and one half percent at fault for the accident and John Lam's injuries.
Lakeside Toyota applied to this Court for writs of certiorari, which were granted. Lam v. State Farm Mutual Automobile Ins. Co., 05-1139 (La.6/24/2005), 904 So.2d 749.

DISCUSSION
Lakeside Toyota argues that the Court of Appeal erred in (1) conducting an improper de novo review of the evidence, (2) finding that the trial court committed legal error in failing to conduct a Daubert[1] hearing as to Lakeside's model and allowing Lakeside's expert to testify regarding the demonstrations he performed on the model, (3) expanding the duty of a repairman to include a duty to fully disclose to a customer the consequences of declining recommended repairs and/or a duty to convey the risks involved in not having the work done, (4) failing to remand the case for a new trial, and (5) failing to address assignments of error raised by Lakeside in its answer to the appeal below.
Normally, a factual finding by a jury cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). As stated by the Court of Appeal, though, where legal error interdicts the fact finding process, the manifest error standard no longer applies and, if the record is complete, an appellate court should make its own de novo review of the record. Evans v. Lungrin, XXXX-XXXX(La.2/6/98), 708 So.2d 731, 735. However, when the erroneous admission affects only one of several jury findings, each jury finding *136 pertinent to liability must be evaluated to determine the applicability of the manifest error rule to each. Picou v. Ferrara, 483 So.2d 915, 918. Here, the jury was presented with two questions pertaining to Lakeside's liability.
The Lams argued below, and the Court of Appeal found, that the trial court committed legal error by allowing Lakeside to introduce into evidence and present to the jury a model ignition system without conducting a Daubert hearing as to its reliability. Assuming that the Court of Appeal was correct and a Daubert hearing was necessary, we must determine which, if any, of the jury findings were tainted by the erroneous admission of the evidence.
The jury was asked to determine, yes or no, if Lakeside Toyota was negligent, and if their answer was yes, was that negligence a cause-in-fact of the accident. The jury answered the first interrogatory in the negative: no, Lakeside Toyota was not negligent. As a result, the jury was not required to answer the second interrogatory, whether or not the negligence was a cause-in-fact of the accident.
The act of negligence that the Lams alleged is contained in their first supplemental and amended petition, that "Lakeside failed to properly maintain and repair the 1989 Toyota Supra." Rec. Vol. 2 at 444. The alleged failure to properly maintain and repair consisted of Lakeside's failing to properly clean excess oil from the spark plug galley of the Supra's engine. They further alleged that this negligence caused the accident and subsequent injuries, "which failure caused or contributed to a loss of engine power on January 31, 1995," and, "the loss of engine power by the 1989 Toyota Supra on January 31, 1995, was a cause of the collision in which plaintiff was injured." Rec. Vol. 2 at 444.
At trial, the plaintiffs introduced evidence as to the presence of oil in the spark plug galley on January 12, 1994, the day that Billy Nguyen last presented the Toyota Supra for repair at Lakeside Toyota, and that Lakeside had failed to remove the oil. Lakeside countered with evidence that Billy Nguyen was told that he needed new spark plug wires and the oil cleaned out of the galley, that he refused these additional services, and that Lakeside's mechanic cleaned out the oil as well as he could without performing the additional services.
The Lams also presented evidence that oil in the spark plug galley caused the spark plug wires to deteriorate and cause a misfire in the engine, resulting in a sudden loss of power. That evidence included expert testimony and the use of a model. Lakeside presented evidence to the contrary, through both expert testimony and use of the model in question.
The trial court gave a lengthy instruction to the jury concerning negligence, the entirety of which follows:
. . . In resolving the issue of liability in this case, there are certain rules of law that you must consider.
One such rule of law is the rule of negligence. The plaintiff claims the defendant was negligent or the defendants were negligent. The foundation of the plaintiff's case is the alleged negligence of the defendants. The general tort law of this case is found in Article 2315 of the Louisiana civil code [sic]. The pertinent portion of which reads as follows. [sic] Every act whatever of man that causes damage to another obligates him by whose fault it happened to repair it. Negligence is the doing of some act which a reasonably prudent persoon [sic] would do under the particular circumstances at the time. Malice, ill will or intent are not necessary elements of negligence. Thus you may find that the *137 defendant was negligent even though you believe he did not act out of malice or willfulness or intent. In determining what constitutes negligence conduct [sic], there is no fixed rule. However, it is to be determined from the facts and circumstances that existed at the time the accident occurred. Ultimately the determination of a person's negligence is based upon reasonableness and if you should conclude that a person acted as a reasonable and prudent person under the circumstances, then a person cannot be found to be negligent. It is for you to determine in light of your own experience what a reasonably prudent person would have done under the same circumstances.
Rec. Vol. 53 at pp. 221-3.
The trial court further instructed the jury on causation:
If a person is in fact the legal cause of an injury or damage to another, he is bound to repair it. Legal cause means an actionable fault which produces injury. A determination of legal causation involves a three step process. First, it must be determined whether defendants [sic] conduct was a cause of plaintiffs [sic] harm. The second question is whether there is a duty on the part of the defendant to protect plaintiff from the type of harm suffered. Third, if such a duty was owed to the plaintiff, did the defendants [sic] acts or omission constitute a breach of that duty. No general rule can be formulated as to whether an act or omission is a legal cause of an injury as it depends on the peculiar facts of each case. It is well settled in our law of negligence that unless an act or omission is a legal cause of an injury, it does not afford the basis for liability.
Another rule which you must consider is proximate cause. For the plaintiff to recover, he must prove that not only was the defendant negligent, but that this negligence was a cause in fact in bringing about the accident and the injuries to [sic] which he sustained. Stated another way, an act will be considered a cause in fact of the accident when after all the evidence is considered, you conclude that the act is a substantial factor without which the accident would not have happened or that the act played a substantial part in bringing about the accident and damages.
Also, this does not mean that the law recognizes only one cause in fact of an accident or damages consisting of only one factor or thing or the conduct of only one person. On the contrary, the conduct of two or more persons may operate either independently or together to cause an accident and damages and in such a case each may be a cause in fact.
To prove that an act is a cause in fact, the plaintiff must show that it is more likely true than not true that the fault of the defendant, if proven, played a substantial part in bringing about or actually causing the injury claimed by the plaintiff. The cause in fact of an injury is the primary or moving act or acts which in a natural or continuous sequence unbroken by any intervening act produces the injury complained of by the plaintiff. It is well settled in our law that unless an omission or acts of commission can be shown to be a cause in fact of the plaintiffs [sic] injury, it cannot be the basis of an award for damages.
Rec. Vol. 53 at pp. 223-5.
Clearly both the plaintiffs, in their petition, and the judge, in her instructions, delineated the difference between the negligent act that Lakeside had allegedly performed and the causation of the accident. The model ignition system, just as clearly, *138 was evidence as to causation, and not as to the negligent act. Accordingly, as we stated in Picou, because the erroneous admission would have affected only the jury's finding pertinent to causation and not its finding as to negligence, a manifest error standard of review regarding the jury's finding of negligence is appropriate, and the Court of Appeal erred in conducting a de novo review of the evidence regarding that finding.
As stated earlier, under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. However, where documents or objective evidence so contradict the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989). But where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844-45.
The jury was presented with factually opposing testimony with regard to Lakeside's negligence. Barry Swanson, the Lakeside mechanic who worked on the vehicle in January of 1994 testified as follows:
Q . . . do you have an explanation as to how that oil got in there?
A No. I mean, I don't thinkHe didn't have it cleaned out. I changed the cam cover gaskets. He didn't have it cleaned, take the valley pan off. You see, there's a pan that goes all over that. There's a black pan that you have to take off. And that's not part of changing out the gasket.
Rec. Vol. 26, pp. 131-2.
Q And taking that off is not part of changing the valve cover gaskets?
A No, sir.
Rec. Vol. 26, p. 132.
Q . . . Is this the center gasket you're talking about?
A Yes.
Q And you're saying that taking this off is not part of this job, changing the valve cover gaskets; right?
A Right.
Rec. Vol. 26, p. 132.
Q So, you don't remove this at all when you do your job?
A I made an estimate to have that cleaned out, which was declined.
Q Oh, you made an estimate?
A I had a second estimate to have that area cleaned out when I saw the oil in it.
Q You saw the oil in there at the time?
A Yes.
Q Do you have the second estimate?

*139 A It would be on the back of that sheet right there, which is no copy of it.
Rec. Vol. 26., p. 132-3.
Q Okay. So, you saw the oil in the valley when you started doing the work after you got approval from the customer to start; right?
A After I got the approval to do the valve coverthe cam cover gaskets.
Q And, at that point, did you then go back to Mr. Meredith and say, "Call the customer because now there is oil in the valley I found?"
A I told Carl that there's oil in the valley and I have to replace the spark plug wires and clean the oil out.
Q But, did you tell him thatbut, you told me you couldn't even see the oil in the valley till after you got it apart?
A I told him after I took the cam cover gaskets off of it I saw the oil in there and after you can take the spark plug wires out.
Q But, that's at a point after the customer approved it?
A Right, after the customer approved it to take the cam covers off.
Q So, you would then run back to Mr. Meredith and say, "Call the customer. We have more work to do"; right?
A Write a second estimate and tell Carl the spark plug wires need to be changed, they're contaminated with oil on them and they have to be changed. They will not last like this.
Q Because they will cause missing; right?
A Because it will cause misfire.
Q Do you see the second estimate in there?
A No. It would be on the back.
Q Would there also be another repair order written?
A It would be written on the back here.
Q Would they also write another repair order?
A No.
Q No?
A No.
Q You specifically have an independent recollection of going back to Mr. Meredith saying, "Hey, look, I found something new. Call the customer?" You remember that?
A I do now.
Q When you ran back and told him that he needed to do this, did you end up replacing the wires?
A No, I didn't.
Q Did you end up cleaning out the oil in this valley?
A As best as possible.
Q As best as possible. How did you clean it out?
A We have a suction hose that will suck up fluids out. [sic]
Rec. Vol. 27, pp. 33-4
Q Okay. So, what you're telling us today is that you saw the oil down in here, you stuck your suction down in here, and you cleaned out the motor, and then you told Mr. Meredith that, "Hey, look, these plug wires got to be changed. He's going to have a problem if he doesn't get it done right; true? [sic]
A I told Carl we have to take the No. 3 pan off, take the spark plugs and the wires out and clean it all out, okay, and then replace the spark plugs and the spark plug wires.

*140 Q Are there any writings before you in Exhibit 137 that support what you're telling us?
A No, there is not.
Q All right. So, you closed it up, loft [sic] whatever oil residue there was down in that engine, and left the spark plug wires on; right?
A Yes.
Q Despite the fact that you felt very strongly they needed to be replaced.
A I wrote on the back of the repair order that they needed to be changed. When the customer declines it, what am I going to do?
Rec. Vol. 27 p. 38.
Karl Meredith, Lakeside's assistant service manager in January 1994, testified that he had no independent recollection of calling Mr. Nguyen and informing him that his spark plug wires should be replaced or that the oil should be cleaned from the spark plug galley. He did testify, however, that it was normal practice at Lakeside for him to call the customer when a mechanic recommended further repairs, and that on this particular repair order he had marked "CDR," representing "customer declines repair."
Billy Nguyen, on the other hand, testified differently:
Q Did you at any time receive a call from Mr. Karl where he told you, Mr. Nguyen, we need to clean out some oil in this engine and its going to cost you more money?
A No.
Q He never called you on that?
A Never called me on that.
Q Would you remember that?
A Yes, I remember. [sic]
Q Would you have approved that work, if he told you it was necessary to fix your car?
A Yes, sir.
Rec. Vol. 28, p. 20.
Q During this January '94 repair job, did Mr. Meredith ever call you and say, Mr. Nguyen, to do a good job, we need to change the spark plug wires?
A Yes.
Rec. Vol. 28, p. 21.
Q If the records that Lakeside Toyota gave us of January of 1994 for the work done don't show spark plug wires on it, they don't show it, then did you have that work done? Do you understand me?
A Like I just say that, okay, I bring the car. That time there are too many different thing on the car. [sic] But I don't know what they do on the car on that day. But he call me. And I just say, okay, go ahead, whatever I need to do to the car, go ahead, fix it. That I say. [sic] But I don't remember what they fix because I bring in there. [sic] So, he told me thatOkay. He call me, change this, fix this. I say, okay, that's fine, go ahead and fix it.
Rec. Vol. 28, p. 23.
Q [Do you remember] Mr. Meredith [calling and recommending] to [you] to change the spark plug wires?
A I do talk to, okay, I bring the car, the more person I talk only that Mr. Carl, the other one more, the guy, but I didn't remember the name, but every time I talk to him he say whatever I need to, you know, do the Toyota, he call me on the phone. [sic] I said okay, do it. I'm never say Oh, okay, you need to change that or you need to change. [sic] So okay, you go ahead and do it, take care of the car, and you see you understand, okay. I got a car. I got the car fully loaded, the top line. I pay the people about $2,500 *141 [sic] that time, I buy the car thirty-five or thirty-two thousand dollars. [sic] I want everything have to be look good, nice and everything, you know, that my baby, right. [sic] so I have to take care of the car, and he called me on the phone, and said Billy, you need, you need to do this, do that, I say okay, go ahead and do it.
Q My question to you was, you do recall Mr. Meredith telling you to replace the spark plug wires, okay, don't you, sir, yes or no?
A Okay. I see that's so long, I don't remember . . .
Rec. Vol. 29, p. 46.
Q Let me repeat it this time a little slower. Did Carl Meredith suggest to you to replace the spark plug wires?
A On when? I don't know.
Q Back when you brought the car in '94 to Lakeside Toyota?
A See now I'm saying I don't remember what I did.
Rec. Vol. 29, p. 47.
The jury was presented with two permissible viewsLakeside either informed Nguyen that he needed his engine cleaned and new spark plug wires or Lakeside did not so inform himand could choose to believe either version of the evidence, based on their belief as to the credibility of the witnesses. Here, they believed that the Lakeside witnesses were more credible than was Billy Nguyen. This Court therefore cannot say that the jury's choice between them is either manifestly erroneous or clearly wrong. The Court of Appeal erred in reversing the jury's finding that Lakeside Toyota was not negligent in this matter.
Our finding that the Court of Appeal erred in reversing the jury's finding of no negligence on the part of Lakeside Toyota renders moot the remainder of Lakeside's assignments of error.
We must, however, address the Court of Appeal's reversal of the jury's finding that Thom Lam, a passenger in the Nissan Maxima driven by Hue Lam, was seventeen and one half percent at fault for failing to require his son to be in a child safety seat. LSA-R.S. 32:295(F) states "[i]n no event shall failure to wear a child passenger seat safety seat be considered as comparative negligence, nor shall such failure be admissible as evidence in the trial of any civil action with regard to negligence, nor shall such failure be considered a moving violation." The Court of Appeal correctly found that the trial court erred in instructing the jury as to the general duty of a parent, thereby undermining the law as set forth in LSA-R.S. 32:295(F), and was therefore correct in reversing that portion of the jury verdict. The seventeen and one half percent fault imputed to Thom Lam will be allocated between Billy Nguyen, Hue Nguyen Lam, and Thomas Perino in percentages equal to the ratio of fault found among them by the jury: Eight and one half percent to Billy Nguyen, five and three tenths percent to Thomas Perino, and three and seven tenths percent to Hue Nguyen Lam. The total fault assessed to those three parties, therefore is forty-eight and one half percent to Billy Nguyen, thirty and three tenths percent to Thomas Perino, and twenty-one and two tenths percent to Hue Nguyen Lam.

DECREE
For the foregoing reasons, we reverse in part and affirm in part the ruling of the court of appeal.
REVERSED IN PART AND AFFIRMED IN PART.
JOHNSON, Justice, dissents and assigns reasons.
*142 JOHNSON, Justice, dissenting.
I respectfully dissent. In my opinion, the appellate court correctly held that failure to conduct a Daubert hearing prior to allowing defendants' use of a model engine to demonstrate how the 1989 Toyota Supra vehicle malfunctioned at the time of this traffic accident, was prejudicial error. This error had a prejudicial effect on the jury's determination of causation and negligence and required a de novo review of the record to determine defendants' fault.
Both parties hired experts to investigate why the 1989 Toyota Supra lost power the night of the accident. Plaintiffs' expert, Mr. Charles Miller inspected the actual vehicle made the subject of this litigation and concluded that an accumulation of oil in the spark plug galley caused the spark plugs to fail. The oil contamination prevented electricity from going through the wires and reaching the spark plugs. Defendants' expert, Mr. Glenn Cupit, testified, on the other hand that "the car actually acted like it ran out of gas."
Counsel for Plaintiffs made an oral motion in limine seeking to exclude defendants' model on the grounds that it did not actually replicate the circumstances under which the spark plugs will fire or "misfire" in a Toyota Supra engine. The Plaintiffs' presented an affidavit prepared by Miller, which listed twenty-one differences between the actual engine and the defendants' model. In Mr. Miller's affidavit, he noted that the computer used on Mr. Cupit's model engine contained different software. Also, defendants' model contained a "rigged" coil pack which did not fire spark plugs in pairs or in combinations. In contrast, the operation of the coil pack on the actual car worked in pairs so that high resistance on one plug affected the matched spark plug in the engine. More importantly, defendants' model engine exposed the spark plugs to nitrogen, which was not present in the actual combustion engine.
The trial court denied the Plaintiffs' motion to exclude the model and testimony and further declined to conduct a Daubert hearing. Mr. Miller's affidavit was proffered and was made part of the record. On cross-examination, Mr. Cupit admitted that he had never presented for peer review any articles on the use of nitrogen gas to replicate the pressures of an internal combustion engine. As recognized in Daubert, an expert witness is permitted wide latitude to offer opinions and is not limited to first hand knowledge and observation. When an "expert" gives his opinion to a jury there must be some assurance that the opinion is more than subjective belief or unsupported speculation. Expert evidence can be both powerful and misleading because of the difficulty in evaluating it.
It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, supra.
Although appellate courts should accord deference to the fact-finder, they nonetheless have a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. Because appellate courts must perform this constitutional function, they have every right to determine whether the trial court verdict *143 was clearly wrong based on the evidence or was clearly without evidentiary support. Id.
In Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993), this Court held that a legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Lasha, supra. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Lasha, supra.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court replaced the "general acceptance" standard of expert testimony with a standard that charges the trial court to act as "gatekeeper" to "ensure that scientific testimony or evidence is not only relevant but reliable." Id. This Court adopted the Daubert analysis in State v. Foret, 628 So.2d 1116, 1121 (La.1993). It is important to note Daubert comes into play only when the methodology used by the expert is being questioned. Dinett v. Lakeside Hospital, 2000-2682, p. 3 (La.App. 4 Cir. 2/20/02), 811 So.2d 116, 119, writ denied, 02-0835(La.05/24/02), 816 So.2d 853. A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and this includes the determination of how much and what kind of education and/or training adequately qualifies an individual as an expert. The court's judgment will not be disturbed by an appellate court, unless it is clearly erroneous. Abshire v. Wilkenson, XXXX-XXXX (La. App.3Cir.5/30/01), 787 So.2d 1158. The court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. Keener v. Mid-Continent Casualty, 01-1357, p. 12 (La.App. 5 Cir. 4/30/02), 817 So.2d 347, 354-355, writ denied, 02-1498 (La.09/20/02), 825 So.2d 1175.
In Daubert, the United States Supreme Court set a new standard to assist district courts in evaluating the admissibility of expert testimony. Daubert established the following non-exclusive factors to be considered by district courts to determine the admissibility of expert testimony:
(1) The "testability" of the scientific theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community. Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786, 125 L.Ed.2d 469.
This Court in Foret characterized the Daubert factors as "observations" which provide a "helpful guide for our lower courts in considering this difficult issue." Foret, supra. The Daubert factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." State v. Chauvin, XXXX-XXXX (La.5/20/03), 846 So.2d 697 Daubert requires that the reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Foret, supra, (quoting Daubert, 509 U.S. at 580, 113 S.Ct. 2786, 125 L.Ed.2d 469).
The court of appeal noted that the potential to taint the jury and have a prejudicial effect on the outcome of a trial necessitates the trial court exercise its "gatekeeper" obligation. The court of *144 appeal concluded that Mr. Miller's affidavit raised enough issues regarding the model engine and the expert's methodology to require the trial court to conduct a Daubert hearing on admissibility. The court of appeal opined that allowing the jury to see and hear Miller's model and testimony had a prejudicial effect on the Plaintiffs' case and ultimately the jury's verdict. I agree. Lakeside's model engine and their expert's methodology was misleading, and persuaded the jury to return a verdict finding Lakeside and Mid-Continent had no liability herein.
Admissibility of expert testimony in Louisiana is governed by LSA-C.E. art. 702, which provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The above article follows Fed. Rule of Evid. 702, according to Official Comment(b) (1988) to LSA-C.E. art.702. State v. Castleberry, XXXX-XXXX (La.4/13/99),758 So.2d 749, 776.
An appellate court has two potential courses to follow: (1) a remand to the district court, or (2) render a decision following a de novo review of the record. Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975), discusses and reaffirms the constitutional power of an appellate court to decide a case, de novo, on the record when the jury verdict must be set aside and given no weight because of trial court error. This power is consistent with appellate jurisdiction of both law and facts. Gonazales v. Xerox, supra; See also La. Const. art. 5, secs. 5 & 10. Of course, the appellate court must have "all the facts before it," i.e., the complete record. Gonzales continues:
In addition to the constitutional authority, and consistent with it, there is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.
Substantial deviation from the rule that appellate tribunals with a complete record before them review facts and render decisions has been infrequent. Id.

Gonzales does not mandate a trial de novo on the record in the appellate court, but instead recognizes such a course of action as an allowable and usually efficient alternative to remand.
NOTES
[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).