FREDERICKA HOMBERG WICKER, Judge.
 

 |2In this personal injury action involving a motor vehicle accident, the plaintiffs/appellants Daren Tompkins and Marvel Bates appeal the judgment in their favor against defendant’s/appellees Mary Savoie and Hartford Insurance Company awarding the plaintiffs damages and medical expenses.
 
 [1]
 
 Following a bench trial, the trial judge awarded Mr. Tompkins and Ms. Bates each $1,500 plus medically related damages in the amount of $1,110.00.
 
 [2]
 
 The appellants argue that the award is abusively low and the trial judge erred in assessing the duration of their injuries. For the reasons that follow, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 On September 2, 2004, Mr. Tompkins and his mother, Ms. Bates, were in a vehicle that was stopped at a red light when Ms. Savoie’s vehicle rear-ended their vehicle.
 

 | ¡¡Mr.
 
 Tompkins
 

 The medical evidence introduced at trial revealed that Mr. Tompkins had two lumbar surgeries, a shoulder scope, and three motor vehicle accidents predating the present accident.
 

 Dr. Robert Dale, an expert in chiropractic treatment, testified that he treated Mr. Tompkins for injuries that he sustained in four motor vehicle accidents occurring in 1999 through 2004; namely, September 28, 1999, June 8, 2001, May 7, 2004, and, September 2, 2004. Dr. Dale testified that Mr. Tompkins presented similar complaints for the four accidents. He stated that his bill for the present accident was $4,285.
 

 The present accident in September 2004 occurred a few months after the May 2004 accident. Dr. Dale stated that he was still treating Mr. Tompkins for injuries he suffered from the recent May accident when he began treating him for the September accident. Dr. Dale testified that the diagnoses for the May and September accidents were very similar and shared the following common diagnoses:
 
 [3]
 
 cervical lumbosacral sprain/strain injuries with at
 
 *297
 
 tendant muscle spasm; myalgia; cervical-gia; cervical radicular syndrome;
 
 [4]
 
 post-traumatic shoulder and hip bursa swelling, sciatic nerve root compression; and, post traumatic sacroiliac joint disorder or pain.
 
 [5]
 

 Dr. Dale explained that contemporaneously with his examination of Mr. Tompkins, Dr. Dale completed a pain diagram describing Mr. Tompkins’ painful areas. Mr. Tompkins’ pain diagrams following the May and September accidents were identical.
 

 |4Pr. Dale maintained, however, that the injuries from the two most recent accidents differed because of his treatment focus. In this respect, he focused his treatment on Mr. Tompkins’ chief complaints. Additionally, he testified that he tried to treat only the new areas of injury from the September accident rather than those areas that were previously treated following the May accident. His treatment for the May injuries focused on the neck and the left shoulder. Also, he treated the low back to a lesser degree.
 

 In contrast, for the September accident, Dr. Dale explained that he treated the right shoulder, the right hip rotator, the right sacroiliac joint, and the lumbosacral paraspinous muscles. He also treated the right side of the lower back area, the right side joint, and the right hip musculature. Dr. Dale stated that he found objective findings in multiple areas such as spasm on palpation in the lumbosacral paraspi-nous muscles and the hip rotator musculature on both sides. Dr. Dale believed that the September accident exacerbated Mr. Tompkins left-sided neck problems and his left-sided lower back problems.
 

 Mr. Tompkins, who was age 47 at the time of trial, testified similarly. He stated that Dr. Dale treated areas that differed from those associated with the May accident. In addition, Mr. Tompkins stated that he had increased level of pain in the same areas that were previously injured.
 

 Dr. Dale wrote medical reports for the May and September accidents, which were introduced into evidence. The reports revealed the following:
 

 Dr. Dale’s November 2004 report regarding the May accident stated that he released Mr. Tompkins from his care on October 13, 2004. Dr. Dale treated Mr. Tompkins beginning May 11, 2004 for a total of 44 treatments. Mr. Tompkins continued to be symptomatic through the final days of his treatment. He had spasm and pain in the cervical shoulder area as well as in the lumbosacral area. | sDr. Dale noted that “his condition because of the previous surgeries is very fragile and this accident caused substantial problems that he will continue to suffer with for some time.” Furthermore, Dr. Dale noted that the September accident “exacerbated a certain amount of problems that he was experiencing.”
 

 Dr. Dale’s March 2005 report regarding the present accident states that he treated Mr. Tompkins for the September accident from September 3, 2004 until February 17, 2005 for a total of 47 times.
 

 Mr. Tompkins testified that from September 7 to October 13, 2004, he had about 10 office visits twice a day. Once a day, Dr. Dale would treat him for his injuries as a result of the May accident and the other time he would treat Mr. Tompkins as
 
 *298
 
 a result of injuries from the present accident. Mr. Tompkins stated that he discontinued the treatments because the treatments only provided temporary relief.
 

 Mr. Tompkins testified that he was experiencing pain before the September accident due to his prior back surgery. His level of pain on a scale of zero to 10 was 10 before the September accident and it remained at this level at the time of trial on May 1, 2007. He attributed his current pain in the left side of his neck, left arm, and both legs to the September accident. He admitted, however, that he did not feel that he had improved from the earlier accident.
 

 Dr. John J. Watermeier testified by deposition. He stated that he first saw Mr. Tompkins on August 31, 2004. Mr. Tompkins reported the motor vehicle accident of May 7, 2004. Dr. Watermeier stated that Mr. Tompkins complained of pain in the neck, the back, the left upper extremity, and the left lower extremity, including the left knee.
 

 Dr. Watermeier testified that he asked Mr. Tompkins to return in three months. The next office visit was November 30, 2004. Mr. Tompkins voiced the |fisame complaints that he made on the prior visit. Dr. Watermeier stated that there was no change on the physical examination. The diagnosis from August to November was lumbar degeneration and cervicalgia of the neck.
 

 Although Mr. Tompkins testified he thought that he told Dr. Watermeier about the present accident, Dr. Watermeier testified differently. Dr. Watermeier testified that Mr. Tompkins never mentioned the September accident. According to Dr. Watermeier, he never offered any treatment to Mr. Tompkins relative to the September accident.
 

 Ms. Bates
 

 Ms. Bates, who was age 70 at the time of trial, testified that she had prior neck and back surgeries.
 

 Dr. Watermeier testified that he treated Ms. Bates from 2002 for knee pain through the time of the September accident. Prior to her visit to him in 2002, Ms. Bates had right knee surgery. Dr. Watermeier stated that on January 6, 2005, Ms. Bates had another surgery on her right knee. At trial, Ms. Bates testified that she did not injure her right knee or left knee in the September accident.
 

 Ms. Bates testified that she was injured in the same May accident in which Mr. Tompkins was injured. She stated that Dr. Dale treated her for that accident. According to Ms. Bates, as a result of the May accident, she had pain in both arms, her neck, and down to her back, hip, and spine. She also injured her right knee when she hit her knee under the dashboard. She stated that when hit by the other vehicle, the seat belt came forward, she twisted her neck, and hit the seat belt.
 

 Ms. Bates stated that following the September accident, she injured her neck. Her entire body was sore and she had pain in her lower back. When asked to distinguish the pain from the May accident, she testified that she had more pain on the left side. When counsel pointed out that she had pain on the left side before the present accident, she explained that it felt a little worse after |7the present accident. She stated that the woman hit them “hard.”
 

 Counsel referred Dr. Watermeier to his note of May 19, 2004 where Ms. Bates referred to a May 7, 2004 automobile accident. Dr. Watermeier reviewed his notes and testified that Ms. Bates stated that on May 7th, she was involved in a motor vehicle accident as a passenger and sustained a direct contusion, blow, or blunt trauma to
 
 *299
 
 the right knee. She said pain started immediately following the injury. She had increasing pain, discomfort, and loss of function since that accident. She said that she had chiropractic care for her neck. His diagnosis that day for the knee was primarily localized osteoarthritis and contusion, and for the neck it was cervicalgia, which is neck pain. Her X-rays showed arthritis in her knee, and evidence of surgery on her neck.
 

 Dr. Watermeier testified that he next saw Ms. Bates on June 24, 2004. On that date he noted that she complained of right knee pain and neck pain. She said that there was no change except for worsening of the complaints for the right knee. He recommended surgical treatment of the right knee.
 

 Dr. Watermeier testified that his standard practice was to follow up with his patients by asking if there had been any new problems or new accidents. Ms. Bates’ next office visit was October 12, 2004. On that date, Ms. Bates reported that she was still having pain in her right knee. He agreed that on that date he noted in her chart that there was no change in her overall health and there were no new accidents or injuries. He stated that these notes were completed contemporaneously with the examination. Ms. Bates was not complaining of cervical-gia on that day. In June, she had complained of neck pain. But, after a few months, her pain complaints focused on the knee. According to his notes, Ms. | ,sBates did not inform him of the September 2, 2004 accident. If she had informed him, he would have referenced that in his notes.
 

 Dr. Watermeier testified that he treated Ms. Bates on the visit of October 12, 2004 for a continuation of the knee condition she had before the September accident. On November 1, 2004, he injected her knee to relieve the pain. Again, on this date, there was no mention of the September 2, 2004 accident.
 

 Dr. Watermeier testified that on October 3, 2005, he noted that Ms. Bates complained of bilateral shoulder pain and he gave her an injection in the shoulders. When asked if she ever told him what caused the shoulder pain, he replied that she did not. He explained that someone who had knee problems and subsequent knee surgery will often be on crutches at the time. When on crutches, the crutches occasionally placed additional stress on the shoulders.
 

 According to Dr. Watermeier, based on the history that Ms. Bates provided, the ultimate surgery on her right knee would be equated more to the May 7, 2004 accident and not to the September accident. He last saw Ms. Bates on August 3, 2005.
 

 Dr. Dale testified that he treated Ms. Bates for the present accident as well as for the May accident. For the May accident Ms. Bates had complaints of pain in both shoulders with severe pain in the right shoulder. She also had pain in the left sacroiliac joint, the left hip area and the right knee. According to Dr. Dale, Ms. Bates complained of headaches and stiffness.
 

 Dr. Dale testified that with regard to the September 2004 accident, Ms. Bates continued to complain of problems in the same areas affected by the May accident. She also complained of mid thoracic pain, increasing sciatic pain on the left, and pain at the right clavicle. Dr. Dale testified that the September accident | ^exacerbated and worsened the areas that Ms. Bates had problems with in the May accident.
 

 Dr. Dale stated that the treatment for the May accident primarily involved the right side of the shoulder and the surrounding musculature without low back
 
 *300
 
 treatment. His treatment for the September accident primarily involved the left shoulder and the left lower back and hip area.
 

 Dr. Dale’s November 5, 2004 report on the May 7, 2004 accident was introduced into evidence. It revealed the following:
 

 The report stated that Dr. Dale released Ms. Bates from his care on October 19, 2004. She began treatment on May 11, 2004 and was treated 47 times. She improved considerably throughout the course of treatment but continued to remain symptomatic through the final days of treatment. Her prognosis was somewhat guarded.
 

 Dr. Dale’s March 15, 2005 report regarding the September 2, 2004 accident was introduced into evidence. It revealed the following:
 

 The report stated that Dr. Dale began treating Ms. Bates on September 3, 2004 for a total of 47 times. He last treated her on February 17, 2005 at which time she discontinued treatment because of surgery on the right knee. She continued to suffer through the final days of treatment.
 

 Dr. Dale testified that with respect to the September accident, when Ms. Bates was released from his care she continued to experience lumbosacral pain, left shoulder pain, and knee pain up to and through the final days of treatment. Dr. Dale and Ms. Bates decided that treatment would not help her further.
 

 According to Dr. Dale’s November 5, 2004 report regarding the May 7, 2004 accident, Dr. Dale diagnosed Ms. Bates as having cervical and lumbosacral | msprain/strain, knee sprain/strain injuries, post traumatic shoulder, knee, and hip bursa swelling, muscle spasms, and myal-gia.
 

 According to Dr. Dale’s report dated March 15, 2005, for the September accident he diagnosed Ms. Bates as having cervical and lumbosacral sprain/strain, post traumatic shoulder and hip bursa swelling, exacerbation of right knee swelling, cervicalgia, cervical radiculopathy and post traumatic sacroiliac joint disorder.
 

 When asked to review his diagnoses for the two accidents, Dr. Dale agreed that he made similar diagnoses relative to the two accidents. Dr. Dale stated, however, that he made a distinction between treatment and complaints. Dr. Dale testified that although Ms. Bates complained about the sacroiliac and the lumbar spine following the May accident, he did not treat those areas. He acknowledged that Ms. Bates had severe pain on palpation and muscle spasm in the lumbosacral area from the May accident. But, he stated that this was not the area of her chief complaint. And, it was not the area that he provided treatment. He explained that his goal was to focus his treatment on the greatest area of pain at the time. Thus, for the May accident, he treated the right shoulder, and the neck area. And following the September accident, the complaints were related more to the lower back, the left hip, the sacral joints, and the left shoulder.
 

 Dr. Dale believed it was more probable than not that the injuries for which Ms. Bates presented to his office on September 3, 2004 were caused by the September 2, 2004 accident. His bill for Ms. Bates was $4,190 for treatment of the September accident.
 

 The trial judge found that the September accident was a minor “fenderbender.” She also concluded that the May 7, 2004 accident was much more significant than the September 2, 2004 accident. She stated that the present |„accident only minimally aggravated the pre-existing injuries of both Mr. Tompkins and Ms. Bates. She awarded damages accordingly.
 

 
 *301
 
 LAW AND DISCUSSION
 

 Louisiana courts of appeal apply the manifest error standard of review in civil cases.
 
 Detraz v. Lee,
 
 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561,
 
 citing Hall v. Folger Coffee Co.,
 
 03-1734 (La.4/14/04), 874 So.2d 90. The manifest error standard of review precludes the setting aside of a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety.
 
 Hall, supra,
 
 03-1734 at 9, 874 So.2d at 98. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently.
 
 Id.
 
 (Citation omitted). The reviewing court should affirm the district court where the district court judgment is not clearly wrong or manifestly erroneous.
 
 Id.
 

 Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Pinsonneault v. Merchants & Farmers Bank & Trust Co.,
 
 01-2217, p. 11 (La.4/3/02), 816 So.2d 270, 278,
 
 citing Stobart v. State, Department of Transportation and Development,
 
 617 So.2d 880, 883 (La.1993). However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination.
 
 Lam ex rel. Lam v. State Farm Mut. Auto. Ins. Co.,
 
 05-1139, p. 7 (La.11/29/06), 946 So.2d 133, 138,
 
 citing Rosell v. ESCO,
 
 549 So.2d 840, 844-45 (La.1989). But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
 
 Id.
 

 | i2Causation is a factual finding which should not be reversed on appeal absent manifest error.
 
 Detraz, supra,
 
 05-1263 at 7 (La.1/17/07), 950 So.2d at 561-62 (Citations omitted).
 

 In multiple accident situations, whether before or after the accident at issue, a tortfeasor is liable only for the direct and proximate results of his wrongful act, including aggravation of any preexisting injuries. Although he takes his victim as he finds him, a tortfeasor cannot be held liable for injuries not attributable to the wrongful act.
 
 Hidalgo v. Old Hickory Ins. Co.,
 
 630 So.2d 252, 254 (La.App. 5 Cir.1993),
 
 writs denied,
 
 94-0381, 94-0399 (La.3/25/94) 635 So.2d 240 (Citation omitted).
 
 Accord: Coleman v. Lewis,
 
 99-0094, pp. 2-3 (La.App. 1 Cir. 3/31/00), 757 So.2d 907, 908,
 
 writ denied,
 
 00-1850 (La.9/22/00), 768 So.2d 1291. In such situations, the plaintiff is required to prove a causal connection between the injuries claimed and the accident by a preponderance of the evidence.
 
 Hidalgo,
 
 supra, 630 So.2d at 254.
 

 When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfin-der can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989) (Citations omitted).
 

 The manifest error standard of appellate review applies even when the evidence before the trier of fact consists solely of written reports, records and depositions.
 
 Virgil v. American Guarantee and Liability Insurance Company,
 
 507 So.2d 825, 826 (La.1987) (per curiam),
 
 reaffirmed in Shephard on Behalf of Shepard v. Scheeler,
 
 96-1690, pp. 14-15 (La.10/21/97), 701 So.2d 1308, 1316-17.
 

 
 *302
 
 11sThe trial judge was presented with factually opposing testimony with regard to the type of impact that occurred in the September accident. On one hand, the plaintiffs described the accident as a “very hard” hit. Mr. Tompkins testified that Ms. Savoie told him she mistakenly hit the gas pedal. In her deposition testimony, Ms. Savoie, however, denied making the statement. Also, Ms. Savoie described the accident as causing her to only feel “a little jerk.”
 

 The parties stipulated that Ms. Savoie had no damage to the front of her car. At trial, Ms. Bates’ vehicle and a damage estimate, along with black and white photographs of Ms. Bates’ car were admitted. Mr. Tompkins identified the photograph of his mother’s car. He also identified the rear of that vehicle. He described the damage that was depicted in the photograph as a dent in the bumper. He stated that the dent was not present before the present accident.
 

 The black and white photographic evidence, which depicts the damage, reveals what appears to be a scrape on the bumper. The photographic evidence is consistent with the claim summary of September 8, 2004, which was introduced into evidence. The claim summary referred to the damage as a “[mjinor dent to grained textured bumper, not repairable.” Another document contained in the estimate exhibit provided an estimate to replace the rear bumper cover. The parties stipulated that the defendants paid the plaintiffs’ $251.75 property damage to Ms. Bates as the owner of the vehicle.
 

 According to Mr. Tompkins’ testimony, the property damages sustained in the September 2004 accident were significantly less than that sustained in the May 2004 accident.
 

 Mr. Tompkins testified that he and his mother were involved in the May accident. He was driving on the interstate at approximately 35 to 40 miles per hour. A girl, who was merging onto the interstate into his lane, drove “pretty fast”, | Mcame out of nowhere, and hit him. He was driving a truck at the time and the damage to the truck was $1,800 or $2,000.
 

 The thrust of appellants’ argument is that the trial judge was manifestly erroneous because she rejected the plaintiffs’ testimony, which was allegedly corroborated by their treating physician and the medical records. In particular, appellants contend that the trial judge should have accepted Dr. Dale’s testimony.
 

 Appellants rely on the case of
 
 Earls v. McDowell,
 
 07-17 (La.App. 5 Cir. 5/15/07), 960 So.2d 242. In that case, the court held: “Uncontroverted evidence should be taken as true to establish a fact for which it is offered absent any circumstances in the record casting suspicion as to the reliability of this evidence and sound reasons for its rejection.” 07-17 at 7, 960 So.2d at 248,
 
 citing Fuller v. Wal-Mart Stores, Inc.
 
 519 So.2d 366, 369-70 (La.App. 2 Cir.1988). That case is distinguishable. There the court found manifest error in the damage award. In that case, there were uncontro-verted medical reports and the trial judge gave no reason for rejecting those reports. In
 
 Earls,
 
 this court reviewed the record and the record, unlike the present case, did not reveal any circumstances that would cast doubt as to the reliability of those reports. 07-17 at 7, 960 So.2d at 248.
 

 Here the trial judge stated that she was unconvinced by Dr. Dale’s dual treatment of the plaintiffs. She was evidently referring to Dr. Dale’s testimony in which he attempted to account for differences in injuries for the May and September accidents by focusing on different treatment areas. The trial judge was unpersuaded by Dr. Dale’s attempt to segregate the two accidents in this fashion when each acci
 
 *303
 
 dent had virtually identical diagnoses in several respects.
 

 Considering that great deference is accorded to the trial court’s factual findings, even when the record consists of documentary evidence, we find no manifest error in the trial judge’s finding that there was a contrived separation of|lfitreatment modalities.
 
 See: Shephard, on Behalf of Shepard v. Scheeler,
 
 96-1690, p. 14 (La.10/21/97), 701 So.2d 1308, 1316,
 
 reaffirming Virgil, supra
 
 (“[G]reat deference is accorded to the trial court’s factual findings, even when the record consists solely of documentary evidence.”).
 

 Importantly, neither Mr. Tompkins nor Ms. Bates mentioned to Dr. Watermeier the September accident or any injuries that might have arisen from that accident.
 

 We find that the trial judge was not manifestly erroneous in awarding damages. The stipulated amount paid for the damage for the replacement of a bumper cover supports her finding that the impact from the September accident was minor. Thus, it was reasonable that the trial judge could have found it doubtful, based on the testimony and evidence, that such a minor accident could have caused the severe and debilitating injuries of which Mr. Tompkins and Ms. Bates complain.
 

 To sum up, we find no manifest error in the trial judge’s concluding that the defendants were liable to the plaintiffs only for those damages associated with the temporary aggravation of their pre-existing conditions occasioned by the September 2004 motor vehicle accident.
 

 DECREE
 

 For the reasons stated herein, the judgment of July 26, 2007 is affirmed.
 

 AFFIRMED.
 

 [1]
 

 .State Farm Mutual Automobile Insurance Company, the plaintiffs' uninsured/underin-sured motorist carrier, was previously dismissed from the suit.
 

 [2]
 

 . At trial, the parties stipulated that $50,000 was the amount of insurance coverage that was in effect.
 

 [3]
 

 . Mr. Tompkins also sustained abrasions and contusions from the May accident.
 

 [4]
 

 . For the September accident, the diagnosis was cervical radiculopothy. For the May accident, the diagnosis was cervical radicular syndrome.
 

 [5]
 

 . Dr. Dale admitted that for the May accident, he could have diagnosed Mr. Tompkins with sacroiliac joint pain. For the September accident, he diagnosed Mr. Tompkins with post traumatic sacroiliac joint disorder.