978 So.2d 522 (2008)
Katie Chisley JONES, et al., Plaintiff-Appellants
v.
Keith J. GAINES and U.S. Agencies Casualty Insurance Co., Inc., Defendant-Appellees.
No. 43,049-CA.
Court of Appeal of Louisiana, Second Circuit.
March 5, 2008.
*523 Anthony J. Bruscato, Monroe, for Appellants.
Louisiana Department of Justice by Judith M. Williams, for Appellees.
Before CARAWAY, MOORE and LOLLEY, JJ.
MOORE, J.
This is an appeal of a partial final judgment under La. C.C.P. art. 1915. We previously affirmed the trial court's grant of a motion for summary judgment for the State of Louisiana, Department of Public Safety/Office of Motor Vehicles ("DPS") and a peremptory exception of no cause of action in favor of the State of Louisiana Health Care Science Center at Monroe *524 d/b/a E.A. Conway Hospital ("E.A. Conway")[1] and the State of Louisiana, Department of Health and Hospitals ("DHH"), reported in Jones v. Gaines, 41,890 (La. App. 2 Cir. 02/28/07), 953 So.2d 922. However, we remanded to allow the plaintiff an opportunity to amend its pleadings to state a cause of action. Plaintiff filed a Fifth Supplemental and Amending Petition and an Amended Fifth Supplemental and Amending Petition. Defendants answered and moved for summary judgment, which the trial court subsequently granted. Plaintiff filed this appeal. For the reasons stated herein, we affirm.

Facts
We adopt by reference the facts we set out in our earlier opinion cited above. The plaintiffs' amended petition after remand alleges additional factual details regarding the alleged fault of the defendants, E.A. Conway and DHH. In summary form, the plaintiffs allege that:
Keith Gaines was diagnosed with schizophrenia ten years prior to the accident in this case, and he has lived with his parents throughout this period. The nature of Gaines' illness is that he can lead a relatively normal life so long as he takes his prescribed medications and avoids alcohol and illegal drugs. If he uses alcohol or illegal drugs, even while on medication, he will lapse into uncontrolled schizophrenia. The result is that Gaines becomes delusional, violent, and is a danger to himself and others, such that he must be hospitalized for his own safety and the safety of others. When Gaines lapses into uncontrolled schizophrenia, he is not able to operate a motor vehicle safely because his judgment and perceptions are impaired.
Gaines has a history of being non-compliant in taking his anti-psychotic medications as well as a history of drug and alcohol abuse. Prior to the accident on April 20, 2001, Gaines often lapsed into uncontrolled schizophrenia and he was placed into the defendant hospital during these lapses. During the twelve-month period prior to April 20, 2001, Gaines was hospitalized in the custody of the defendants on five separate occasions. His last release from the defendant hospital was on April 18, 2001.
Gaines was repeatedly determined by coroner's certificate to be a danger to himself and others. Additionally, the medical records reveal that Gaines frequently suffered from delusions, schizophrenia, violent behavior, threats, chronic alcohol and drug abuse, and was non-compliant with the prescribed anti-psychotic drug regimen. Based on these records, plaintiffs allege that Dr. Agarwal and all administrators and medical staff had actual or constructive knowledge of Gaines' condition and dangerous propensities.
Plaintiffs contend that Gaines' pattern of behavior is representative of a small group of non-compliant schizophrenics whose condition is obvious and highly predictable to any person of ordinary common sense with a knowledge of schizophrenia. They allege that the defendant routinely treats these people by hospitalizing them long enough to stabilize them and then releases them back into the community where they will, predictably, relapse and become a danger to themselves and others. Hence, plaintiffs contend that the defendants have taken no precautionary steps to ensure the safe release of these patients, including not returning patient belongings that constitute *525 dangerous instrumentalities, not establishing a procedure for notifying the DPS of their identity and mental instability that may make it dangerous for them to operate a motor vehicle, and having minimal or no procedures for coordinating a patient's release with the patient's family or caregivers, namely to ensure that any dangerous instrumentality is returned to the patient's family instead of the patient.
Plaintiffs contend that Gaines' illness makes him an unsafe driver, but he was able to purchase, register, and own an automobile because the defendants never reported Gaines' condition to DPS.
In this instance, plaintiffs allege that when Gaines checked into the hospital in the beginning of April of 2001, he relinquished custody of certain personal items to the defendants, including a set of car keys. Plaintiffs contend that a car is a dangerous instrumentality.
Although Gaines entered the hospital on his own volition, in order to leave, he was required to give 72 hours or three days notice to obtain a release. On April 15, Gaines gave his three-day notice. According to established procedure, medical personnel then evaluated him over the next three days to determine whether to release him or obtain a coroner's certificate to keep him hospitalized indefinitely. At this time, Gaines' parents were attending a funeral out of town. Also, Gaines' physician, Dr. Rita Agarwal, changed Gaines' anti-psychotic medication, and, according to plaintiffs' allegations, it was not clear how Gaines would respond to the new medication. Dr. Agarwal approved Gaines' release and Gaines was discharged on April 19, 2001, with instructions to return for an appointment on April 23, 2001.
Plaintiffs contend that Gaines' parents were aware of his dangerous propensities and acted as his caregiver and supervisor. Because they were aware that Gaines might be released while they were out of town, they concealed all car keys in the family home to ensure that Gaines would not have unsupervised access to a vehicle while in an uncontrolled schizophrenic state. They also made arrangements for Gaines' cousin to pick him up from the hospital instead of driving himself home.
When Gaines checked out of the hospital, his car keys were returned to him along with his other personal belongings. Plaintiffs contend that by returning Gaines' car keys to him, the defendants placed him in control of a dangerous instrumentality.
Less than 48 hours after his release, Gaines consumed alcohol and had a relapse. He subsequently drove his vehicle recklessly and at a high speed, ran a red light which caused a collision, killing the victim in this case.
Plaintiffs allege that the victim's death was caused by the gross, willful, and wanton neglect of the defendants. The alleged acts and omissions included:
(A) the defendant's failure to establish any system for managing "revolving-door schizophrenics" by
(1) establishing a practice or procedure for notifying the DPS of the identity of persons who should be investigated for possible restriction of their driving privileges.
(2) establishing a practice or procedure for removing dangerous instrumentalities from the possession and control of persons with a history of "revolving-door schizophrenia."
(3) establishing an adequate procedure for consulting with caregivers in planning the release of potentially dangerous individuals.
(B) the premature release of Gaines when he had just been placed on a new *526 medication without coordinating the release with his parents.
(C) by giving Gaines' car keys to him instead of his cousin, or warning his parents about the situation or taking other steps to secure the keys.
After the plaintiffs amended their petition, E.A. Conway and DHH moved for summary judgment. The matter was taken up and argued, after which the trial court granted the motion and dismissed plaintiffs' claims against the defendants with prejudice. There were no written reasons issued by the court. Plaintiffs filed the instant appeal.

Discussion
A court of appeal reviews a trial court's ruling on a motion for summary judgment de novo. Jones v. Estate of Santiago, 03-1424 (La.4/14/04), 870 So.2d 1002; Hargrove v. Goods, 41,817 (La.App. 2 Cir. 2/28/07), 953 So.2d 968.
Summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by law. The procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2); Racine v. Moon's Towing, 2001-2837 (La.05/14/02), 817 So.2d 21. If the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law, then summary judgment shall be rendered. La. C.C.P. art. 966; Patton v. Strogen, 39,829 (La.App. 2 Cir. 8/17/05), 908 So.2d 1282, writ denied, 2005-2397 (La.3/17/06), 925 So.2d 548.
The burden of proof on a motion for summary judgment remains with the movant. La. C.C.P. art. 966(C)(2). However, when the movant will not bear the burden of proof at trial on the matter before the court on the summary judgment motion, the burden does not require the movant to negate all essential elements of the adverse party's claim, but rather to point out that there is an absence of factual support for one or more elements essential to that claim. La. C.C.P. art. 966(C)(2). If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial, there is no genuine issue of material fact. Id.
As provided in La. C.C.P. art. 967(B), the adverse party may not rest on the mere allegations or denials of his pleading in response to a properly made and supported motion for summary judgment; rather, his response, by affidavits or otherwise, must set forth specific facts showing a genuine issue for trial. Otherwise, summary judgment shall be rendered against him, if appropriate. La. C.C.P. art. 967(B).
On appeal, the plaintiffs assigned no errors per se to the trial court's judgment, but contend that there are four issues raised by their appeal of the judgment:
(1) Was the E.A. Conway psychiatric unit under the sole control of DHH at the time of Mr. Gaines' hospitalization in April of 2001?
(2) Does E.A. Conway or DHH have any duty to the general public?
(3) Was the duty breached in this case?
(4) Have defendants conclusively established their right to the affirmative defense of immunity under La. R.S. 9:2798.1?
Based on our review of the record, we conclude that the trial court granted the motion for summary judgment on grounds that neither E.A. Conway or DHH, or both, breached a duty owed to the plaintiffs that was a legal cause in the death of the victim in this case. Accordingly, the dispositive questions in our de novo review *527 in this case are whether the defendants owed a general duty to the plaintiffs, and, if so, whether any breach of that duty was the legal cause of the harm suffered.
Did E.A. Conway or DHH owe a general duty to the plaintiffs?
The substance of plaintiffs' argument that it has stated a cause of action against the hospital and DHH in this case is that their claim lies in negligence and it is not based on violation of La. R.S. 9:2800.2, which states that psychologists and psychiatrists and the like shall not be liable for a breach of confidentiality for warning "a clearly identified victim or victims" of a significant and "specific threat of physical violence." Id. In other words, the plaintiffs allege that their amended petition is based not on the breach of a statutory duty but rather a legal duty, that is, the obligation to conform to the standard of conduct of a reasonable man under like circumstances. Barbarin v. Dudley, XXXX-XXXX (La.App. 4 Cir. 12/20/00), 775 So.2d 657.
We observe that there is a split in the Louisiana circuit courts of appeal regarding whether psychiatrists, psychologists, and the public entities that employ them have any duty to third persons beyond the limited context of La. R.S. 9:2800.2. For example, in Grady v. Riley, 01-1197 (La. App. 5 Cir. 2/26/02), 809 So.2d 567, the Fifth Circuit held that a psychiatrist has a duty to protect third persons only in a limited scenario and affirmed a summary judgment dismissing the psychiatrist, hospital and clinic where the plaintiff alleged the defendants negligently released a patient under medication for bipolar disorder, and who subsequently recklessly operated an automobile and caused a head-on collision causing severe injuries and disability to the plaintiff.
In Dunnington v. Silva, M.D., XXXX-XXXX (La.App. 1 Cir. 9/28/05), 916 So.2d 1166, the First Circuit held that a psychiatrist's duty to warn or to take reasonable precautions to provide protection from violent behavior arises only under the circumstances specified in La. R.S. 9:2800.2(A) and the "statute is exclusive as to claims by third parties." Id. at 1171.
The same issue was squarely faced in Sanchez v. State Through Dept. of Health and Human Resources, 506 So.2d 777 (La. App. 1 Cir.1987), where the plaintiff alleged negligence on the part of Conway Memorial Hospital ("Conway") and DHH for failing to protect the public by not recognizing a patient's violent propensities and by releasing the patient from the hospital and thereby placing him in a position where he could commit violent acts. The patient, who had a long history of mental illness, entered his parents' home and killed his sister and her husband three months after his release from Conway. The patient had on different commitment occasions made threats to kill his wife, his parents, the president and the pope and even stated that all teenage girls should die. A PEC was issued in mid-February pursuant to the patient's wife's request, but the patient was out of state and could not be found. He subsequently returned him home, where he remained several days before committing the killings.
The trial court granted the defendants' exception of no cause of action and motion for summary judgment on grounds that any negligence on the part of the defendants was not a cause in fact of the deaths, and that the duty owed by these defendants to confine the patient did not extend to the possibility that he would shoot the victims. The court of appeal affirmed, holding that the duty of Conway to care for and treat the patient did not include within the ambit of its protection the risk that after being released he would, *528 through his own unanticipated and independent actions, injure a third person.
On the other hand, Davis v. Puryear, 95-1637 (La.App. 4 Cir. 5/1/96), 673 So.2d 1298, a panel from the Fourth Circuit held that a state mental health institution and its physician employees owe a general duty to the public to exercise reasonable care under certain circumstances to guard against harm to third persons and this duty extends beyond the duty to warn or a duty to identified potential victims. In Davis, the victim, Valerie Davis, was raped and murdered by David Puryear two days after he escaped from the Southeast Louisiana Hospital (SELH), a state mental institution. Puryear had a years-long history of mental illness that included violence to himself and others, and on several previous occasions, he had been admitted to the East Louisiana Hospital ("ELH") for his severe mental infirmities.
The trial court found that SELH was liable because it allowed a psychotic patient to escape. SELH and the other defendants appealed, alleging that they did not breach any standard of care. The Fourth Circuit affirmed, holding that SELH was negligent because it deviated from the standard of care in failing to obtain Puryear's medical records from ELH, which would have revealed that Puryear had a history of violence and escapes, which thereby mandated rigorous anti-elopement measures. Consequently, the court held that the hospital's failure to take anti-elopement measures was also a breach of the standard of care.
The Davis decision, supra, was subsequently criticized in a law review casenote for imposing strict liability on mental healthcare facilities when an injury follows a patient's escape even when there is no causal relationship between the negligence and the escape:[2]

Davis is significant because the Fourth Circuit has extended the duty of the state mental health system beyond the bounds of any case in Louisiana jurisprudence. The mental health facility now has a duty to use whatever reasonable measure necessary to protect the public from being harmed by a potentially dangerous mental health patient. The extension of this duty is beyond the limits of the legislative intent of the law, and the court basically imposes strict liability on the facility for the actions of escaped patients and, perhaps, even patients released from care.
The Fourth Circuit essentially expands the underlying policy of health care facilities beyond what was intended by the mental health statute. . . . The Louisiana legislature defined the policy of the Mental Health Law indicating that the facility is to provide care to the mental patient in the least restrictive manner possible and protect the patient's rights. This policy statement establishes that the interest of the state is to protect and treat the patient, not protect the public. There is an interest in detaining dangerous persons, but the statute indicates that the facility has a duty to the mentally ill to protect their rights and liberties. Though the rights of the patient and the protection of the public present a competing interest in some cases, the mental health facility's duty should be first to the patient to ensure proper treatment and proper confinement periods. Because the patient in many circumstances cannot speak for himself and surrenders himself to the mental health facility and his care provider, the facility is often in the *529 unique position of providing the only protection available to the patient. If the facility is more concerned with public protection or liability, treatment of the mentally ill becomes only a secondary interest, contrary to the stated policy of the law. The Davis result deviates from the legislative policy of protecting the liberty interests of the patient and mandates that mental health facilities be more restrictive in confining all patients, not just those who are dangerous, to avoid liability. (Footnotes omitted).

Davis also brings to the forefront a split in the circuit courts regarding the analysis of the duties of mental health facilities. The First Circuit, while acknowledging the language in Frank regarding the purpose of incarceration, still requires a strong causal relationship between the injury and the escape to determine the liability of either the penal or mental institution. In contrast, the Fourth Circuit in Davis held that the purpose of the two institutions is so vastly different that the analysis in prison cases must be dismissed as "totally inapplicable" to mental health facilities. Because no causal relationship between the negligence and the escape is required, the Fourth Circuit's analysis imposes strict liability on the mental health facility for injury which follows a patient escape. Accordingly, if an escape occurs and someone is injured by the escapee, the facility is liable. Conversely, the First Circuit prohibits recovery absent a strong causal relationship between escape and injury, and expressly rejects the application of strict liability in a prisoner/patient escape.
In the instant case, unlike Davis, Gaines was released from E.A. Conway pursuant to the statutory procedures in La. R.S. 28:52.2.[3] Additionally, Puryear had a history of violence and escapes evidenced in his medical records. The plaintiffs in this instance allege, however, that E.A. Conway and DHH were negligent by failing to establish any system for managing "revolving-door schizophrenics" by not (1) establishing a practice or procedure for notifying the DPS of the identity of persons who should be investigated for possible restriction of their driving privileges; (2) establishing a practice or procedure for removing dangerous instrumentalities from the possession and control of persons with a history of "revolving-door schizophrenia;" and, (3) establishing an adequate procedure for consulting with caregivers in planning the release of potentially dangerous individuals. Also, the plaintiffs allege that the hospital breached a duty to them by the premature release of Gaines when he had just been placed on a new medication without coordinating the release with his parents and by giving Gaines' car keys to him instead of his cousin, or warning his parents about the situation or taking other steps to secure the keys.
In light of the foregoing analysis of the case law, we conclude that La. R.S. *530 28:52.2 and La. R.S. 9:2800.2 establish the conditions and obligations for the release of patients like Gaines and the duty of health care providers of these patients to warn "clearly identified victim or victims" of a significant and "specific threat of physical violence." Clearly, the facts of this case are distinguishable from the duties contemplated in La. R.S. 9:2800.2 inasmuch as Gaines' threats of physical violence[4] referred to by plaintiffs did not identify the victims in this case. More importantly, the ultimate issue in this case does not concern threats of violence, but whether the hospital had full knowledge that Gaines would become, after his release, incompetent to drive an automobile. The alleged omissions in this case do not, in our view, constitute a breach of the standard of care, as found in Davis. We also conclude that were we to impose the duties suggested by the plaintiffs, we would violate the clear policy of La. R.S. 28:52.2 and other provisions of the Mental Health Law. The policy expressed in this law establishes that the interest of the state is to protect and treat the patient, not protect the public. While there is an interest in detaining dangerous persons, the statute indicates that the facility has a duty to the mentally ill to protect their rights and liberties. Hence, although the rights of the patient and the protection of the public present a competing interest in some cases, the mental health facility's duty should be first to the patient to ensure proper treatment and proper confinement periods. Based on our review of the record, we cannot conclude, based solely on the fact of Gaines' history of periodic non-compliance with his medication regimen and his being involved in two prior accidents of unknown circumstances, that the hospital and DHH had a duty to establish the measures suggested by the plaintiffs.
We turn now to the questions of whether the hospital and DHH breached a duty to the plaintiffs and whether the breach of this duty was the cause of the plaintiffs' harm. Plaintiffs allege that the hospital breached a duty to them by the premature release of Gaines when he had just been placed on a new medication without coordinating the release with his parents and it breached a duty by giving Gaines' car keys to him instead of his cousin, or warning his parents about the situation or taking other steps to secure the keys. They contend that Gaines' behavior was predictable and foreseeable.
We think that the issue here is demonstrably a question of whether the hospital's release of Gaines with his car keys was a legal cause of the injuries suffered by the plaintiffs. For the following reasons, we hold that Gaines' release with his car keys was not a legal cause of the plaintiffs' harm.
Automobile keys and automobiles do not constitute "dangerous instrumentalities" per se. An automobile may become a dangerous instrumentality where the owner permits it to be driven in a defective condition that renders it uncontrollable when operated or where he allows it to be operated by incompetent persons who do not know how to drive, by insane persons or by persons who are similarly incompetent by reason of temporary or permanent defects in their mental or physical faculties, and in such cases where it appears that the owner has entrusted the automobile to an incompetent person with full knowledge of the borrower's inability, *531 the owner may render himself responsible to another who is injured by carelessness of the borrower. Midkiff v. Watkins, 52 So.2d 573 (La.App. 1 Cir.1951). We view the hospital's act of giving Gaines the keys to his car as analogous to those cases in which a vehicle owner leaves his keys in the ignition of a car and subsequently a joy rider takes the vehicle, drives recklessly and causes harm to a third party. Against the allegation that leaving the keys in an unattended vehicle creates an unreasonably dangerous condition, our Supreme Court has stated that "it is well-settled under Louisiana jurisprudence that the mere act of a motorist in leaving keys in a car does not create liability on the part of the motorist where a thief steals the car and injures a third party." Racine v. Moon's Towing, 2001-2837 (La.5/14/02), 817 So.2d 21, 25. The court said that the owner of a vehicle who leaves the keys in the ignition owes no duty to the public at large against the risk of a thief's negligent operation of the automobile. Id. at 25, citing Midkiff v. Watkins, supra. In Racine, supra, the court concluded that the fatal injury to plaintiffs' son occurred not from the owner's act of leaving the keys in the truck, but from the victim's brother's deliberate act of breaking into the locked truck and starting the engine.[5]
In Oaks v. Dupuy, 32,070 (La.App. 2 Cir. 8/18/99), 740 So.2d 263, writ not considered, 1999-2729 (La.11/24/99), 750 So.2d 993, a negligent entrustment case involving a drunk driver, a panel from this court reversed a summary judgment in favor of the defendant dismissing the claim and holding that there remained a material issue of fact as to the owner's knowledge of his son's competency as a driver. Regarding the duty of the owner of the vehicle, the court stated:
Under the negligent entrustment theory, the lender of a vehicle is not responsible for the negligence of the borrower unless he knew or should have known that the borrower was physically or mentally incompetent to drive; if the lender knew or should have known of the borrower's incompetency then he is responsible for the harm resulting from the incompetent operation of the vehicle. (Citations omitted). We believe a reasonably prudent person has a clear duty to recognize the manifest danger of making a long-term, open-ended loan of a vehicle to someone they know or should know is an habitual abuser of alcohol and is prone to drive a vehicle while under the influence of alcohol. (Citation omitted). A prudent person should recognize that under these circumstances it is highly likely that serious injuries or death will foreseeably result.
Although the owner's son had apparently been using the vehicle for several months without incident, there was substantial evidence submitted by the plaintiffs that the son had a strong record of alcohol abuse, drunk driving and a reputation in the community for that behavior. The plaintiffs submitted affidavits from the victim, her brother, a friend, and the insurance salesman who sold the owner the insurance policy on the vehicle, each of which attested to the son's "tendency to drink and be under the influence of alcohol and that he had a reputation in the community of Haughton as an habitual drinker." Id. at 266. The son testified that his driver's license had been revoked twice, once due to the accident at issue and once due to a DWI. He was in a fatal boating accident in which three of the passengers were killed when a boat ran over the boat *532 he was operating; he caused two other accidents, and he admitted to leaving the scene of one of them. He was uninsured in the instant accident since his own truck had been repossessed and his father was lending him the insured Blazer. At the time of the accident he was drinking beer on a daily basis, in varying amounts up to a six-pack a day.
We observe that the panel in Oaks was particularly impressed with the fact that the accident occurred in "a small community where everybody knows everybody else," the driver's "reputation for drinking and driving, the close relationship between [the son] and his father, and the fact that the deceased father cannot now testify." Id. at 267. It concluded that a judicial determination of the father's knowledge of his son's drinking behavior is essential to the resolution of the case.
Oaks, supra and most negligent entrustment cases involving lending an automobile are only marginally analogous to the instant case because the hospital did not own the vehicle and it was obligated to return Gaines' personal belongings upon his release, including the car keys to the vehicle which the hospital did not own, nor did it control. Assuming, for the sake of argument, that the hospital could have kept Gaines' keys from him, there is clearly not enough evidence that the hospital knew or should have known that Gaines would at some point in the future become non-compliant with his medications and become psychotic or intoxicated or both and drive an automobile recklessly. Although Gaines did have a history of not taking his medicationsa fact which the hospital was awareGaines' driving history, in which plaintiffs allege he was involved in two previous accidents, is not really remarkable in and of itself.
As observed by the Supreme Court in Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972):
Foreseeability is not always a reliable guide, and certainly it is not the only criterion for determining whether there is a duty-risk relationship. Just because a risk may foreseeably arise by reason of conduct, it is not necessarily within the scope of the duty owed because of that conduct. (Footnote omitted). Neither are all risks excluded from the scope of duty simply because they are unforeseeable. (Footnote omitted). The ease of association of the injury with the rule relied upon, however, is always a proper inquiry.
A more instructive case is Todd v. State Through Dept. of Social Services, Office of Community Services, 699 So.2d 35, 96-3090 (La.9/9/97). Sheila Todd (Todd) brought an action, individually and on behalf of her son, Joshua Todd (Joshua), for his wrongful death after 11-year old Joshua committed suicide by hanging. The plaintiff alleged that Cathy LaBauve (LaBauve), a caseworker-investigator for the Office of Community Services through the Department of Social Services for the State of Louisiana (OCS), negligently removed Joshua from his mother's custody and failed to properly secure his safety, causing Joshua's death. The trial court found OCS and LaBauve jointly, severally, and solidarily liable for the wrongful death of Joshua. The Fifth Circuit affirmed. The Supreme Court granted a writ of certiorari and reversed the judgment "find[ing] no legal cause between OCS's alleged negligence and Joshua's death." Id. at 35. The case is both analogous and instructive regarding legal cause:
"Cause" in legal cause demands an inquiry into whether a legal standard of care exists and requires delving into policies for and against extending the asserted *533 legal standard of care to protect the particular plaintiff against the particular harm. (Citations omitted). Moreover, whereas the question of cause-in-fact involves a factual determination, the determination of legal cause involves a purely legal question. (Citation omitted).
Every negligence case must be decided on its own facts and circumstances. Roberts v. Benoit, 605 So.2d 1032 (La. 1991). In some instances a risk may not be found within the scope of a duty where the circumstances of that particular injury to that plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty. See Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
We are mindful that foreseeability, as the determining test, is neither always reliable nor the only criterion for comparing the relationship between a duty and a risk. Some risks that arise because of a defendant's conduct are not within the scope of the duty owed to a particular plaintiff simply because they are unforeseeable. The ease of association of the injury with the rule of conduct that is urged, however, is the proper inquiry. Hill, supra. Nevertheless, the extent of protection owed a particular plaintiff is determined on a case-to-case basis to avoid making a defendant an insurer of all persons against all harms. (Citation omitted).
The legal issue in White v. White, 479 So.2d 588 (La.App. 1 Cir.1985), as well as in Frank v. Pitre, 353 So.2d 1293 (La.1977), is very similar to the issue at hand. The plaintiff in White sued the state after his child of eighteen months was struck and killed by an automobile in front of the residence of the child's mother. Approximately two weeks before the fatal accident, plaintiff had reported to the Department of Health and Human Resources (DHHR) that the mother was neglecting the child, and asked DHHR personnel to intervene to protect his child until the custody hearing. The court held that the mere failure to investigate did not give rise to a cause of action against the state for the wrongful death of the child. It further stated that the state did not have custody of the child, and that the negligence of the mother, the car owner, and the driver could not be imputed to the state. The White court analogized the issues involved to those of Frank, in which the court refused recovery against a sheriff to a policeman who had been shot by a prisoner on a pass. This Court stated:
It is not enough to say that if [the prisoner] had not been released under the sheriff's policy of weekend passes, the tragedy would not have occurred. If [his] friend had not given him a ride to town the shooting would not have happened. There must be something more; there must be a closer connection between the act of the defendant and the injury of the plaintiff.

Frank v. Pitre, 353 So.2d at 1296.
The Supreme Court determined that in order for Todd to recover, she had to show that LaBauve and OCS breached their duty to investigate, and thereby caused Joshua's death. White, supra. That is, there must be a proximate relation between the alleged negligence and the injury.
The facts in this case do not show a proximate relation between the release of Gaines with his car keys and his subsequent decision some 48 hours later to intoxicate himself, get in his car, drive recklessly and cause the death of the victim in this case. When Gaines was released, he was compliant with his medication and he was not intoxicated. Under La. R.S. *534 28:52, after Gaines gave his 72-hour notice, the hospital was required to release Gaines unless it was deemed appropriate to obtain a physician's emergency certificate. Under the facts of this case, those circumstances did not exist.
Stated differently, the release of Gaines and giving him his car keys were too remote in the chain of causation in this case, and thus these actions did not constitute a substantial factor in the harm that resulted from Gaines' reckless operation of the automobile two days later. Durapau v. Jenkins, 95-120 (La.App. 5 Cir. 5/30/95), 656 So.2d 1067. In Durapau, the First Circuit affirmed a summary judgment dismissing the plaintiff's tort action against a psychiatric hospital where the plaintiff alleged that the hospital negligently discharged from its care a dangerous patient who subsequently stabbed the plaintiff after the patient was released. The patient, Jenkins, had been treated for paranoid schizophrenia for a number of years by at least four mental institutions and had been involuntarily committed to the defendant, DePaul Hospital, by coroner's certificates three times earlier in the same year of the stabbing incident. Jenkins' mother obtained the commitment orders which also repeated her complaint that Jenkins was belligerent, suicidal and homicidal. After he was brought to DePaul Hospital, the defendant consented to voluntary commitment and treatment. He was treated with medications and his symptoms dissipated. According to the hospital representative, so long as Jenkins remained on his medication he was not a danger to himself or others, and therefore there would be no need for confinement. Jenkins' treating psychiatrist, Dr. Kailas, authorized Jenkins' discharge. It was undisputed that the hospital released Jenkins because the treating psychiatrist approved it.
The First Circuit concluded that in order for the plaintiff to maintain an action against the hospital for negligent release, there would need to have been allegations or evidence that the hospital acted contrary to the psychiatrist's recommendation or permitted Jenkins to leave without proper authorization or that the hospital was negligent in some way for following the psychiatrist's recommendation. Absent this, the hospital breached no duty owed to the plaintiff to protect him from the injury he suffered at the hands of Jenkins.
In this case, we conclude that the hospital breached no general duty to the plaintiff or the public when the nurse at the hospital returned Gaines' car keys to him upon his release. Nor do we find that the hospital or DHH breached a duty because it did not have a policy regarding the return of car keys. We do not find that the car keys constituted "a dangerous instrumentality" where Gaines was not intoxicated or in a psychotic state and was taking his medications when released from the hospital.
Because we conclude that the defendants breached no general or statutory duty owed to the plaintiffs in this case, we pretermit determination whether defendants have met the necessary conditions to raise the affirmative defense of immunity under La. R.S. 9:2798.1 and the issue of whether E.A. Conway was under the sole control of DHH.

Conclusion
For these reasons, we affirm the summary judgment dismissing the plaintiffs claim against E.A. Conway and DHH with prejudice. Plaintiffs are assessed the costs of the appeal.
AFFIRMED.
NOTES
[1] In plaintiffs' Amended Fifth Supplemental and Amending Petition discussed herein, plaintiffs changed this defendant's name to State of Louisiana, through the Board of Supervisors of Louisiana State University Agricultural and Mechanical College ("E.A. Conway"), but state it has no legal consequence.
[2] Carl E. Helmers, III. Davis v. Puryear: A New Direction for the Liability of Mental Health Facilities in Louisiana, 42 Loy. L.Rev. 629 (Fall 1996).
[3] § 52.2. Formal voluntary admission.

A. Any mentally ill person or persons suffering from substance abuse desiring admission to a treatment facility for diagnosis and/or treatment of a psychiatric disorder or substance abuse and who is deemed suitable for formal voluntary admission by the admitting physician may be so admitted upon his written request.
B. A patient admitted under the provisions of this Section shall not be detained in the treatment facility for longer than seventy-two hours after making a valid written request for discharge to the director unless an emergency certificate is executed pursuant to R.S. 28:53, or unless judicial commitment is instituted pursuant to R.S. 28:54, after making a valid written request for discharge to the director of the treatment facility.
[4] We do not consider the two instances in which Gaines made threats and had to be restrained during his confinement to constitute a serious threat of violence to third parties in the sense contemplated by the statute.
[5] Although the truck was locked, the windows were partially rolled down enough for the teenager to slide through the window and start the truck.