LOBRANO, J.,
concurs in part, dissents in part, and assigns reasons.
IH concur with the majority’s findings and reasoning that the Plaintiffs/Appellees, Sharon and Michael Harper, the children of Willie Warren Harper (“Harper”), do not have a cause of action for deprivation of civil rights under 42 U.S.C. § 1983, and the trial court erred by denying the exception of no cause of action filed by the State of Louisiana through its Department of Health and Hospitals (“DHH”). I concur in the majority’s finding and reasoning that La. R.S. 13:5106 places a statutory cap on damages against DHH and that the Plaintiffs/Appellees failed to prove their wrongful death claim.
However, I disagree with the majority as to the standard of review in this case with respect to liability of DHH. I find that legal errors in the jury interrogatories affected the verdict on liability requiring a de novo review oh appeal. Accordingly, I reviewed this record de novo, and I find that the. Plaintiffs/Appellees proved by a preponderance of the evidence at the jury trial in this matter that, due to the negligence of DHH, Harper was wrongfully confined as an insanity acquittee while in the custody, care, and treatment of DHH from March 20, 1990 to. January 22, 1997. I do not find any fault on the part of the Orleans Parish Sheriffs Office (“OPSO”), the Orleans Indigent Defender Program |2(“OIPP”), or the judges or staff of the Orleans' Parish Criminal District Court (“Criminal Court”) for Harper’s wrongful confinement from March 20, 1990 to January 22, 1997.
With respect to damages, I disagree with the majority’s finding that the Plaintiffs/Appellees failed to establish that they suffered any loss of consortium. I find that the Plaintiffs/Appellees proved that they suffered a measurable and compensa-ble loss of love, affection, society, happiness, and companionship. However, I would reduce the amount awarded by the jury. I find that damages for loss-of consortium should be in the amount of $25,000.00 to each Plaintiff/Appellee and damages for the wrongful detention of Harper should be in the amount of $900,000.00. I would limit the damage award to $500,000.00 in 'compliance with the statutory cap provided in La. R.S. 13:5106.

Statement of Facts

The testimony and exhibits in this case showed that Harper’s periods of confinement. as a result of his arrest on March 30, 1984[1] were as follows:
(1) From March 30, 1984 to June 28, 1984,. Harper was in the custody of the OPSO at Orleans Parish Prison (“OPP”);
(2) Criminal Court ordered Harper in the custody, care, and treatment of DHH on June 28, 1984, Harper was admitted to Feliciana’Forensic Facility (“FFF”)[2] to restore his competency, on January 23, 1985, and Harper was brought to trial on August 14,1985;
*506 |s(3) From August 14, 1985 to March 20, 1990, Harper, as an insanity acquittee, was in the custody of OPSO at OPP and was under the care and treatment of DHH;[3]
(4) From March 20, 1990 to January 22, 1997, Harper, as an insanity acquittee, was in the custody of DHH at FFF and East Louisiana State Hospital (“ELSH”)[4] and was in the process of being deinstitutional-ized and conditionally released after the Criminal Court found in 1989 that Harper should be released from confinement because he was not dangerous to himself or others.
The following detailed chronology is helpful:
March 30, 1984 Harper was arrested for theft.
April 13, 1984 Harper was arraigned before Judge Miriam Waltzer at Criminal Court. Court appointed Maurice Hattier of OIDP to represent Harper. Attorney Hattier represented Harper at arraignment. Harper pleaded not guilty and not guilty by reason of insanity (“NGRI”).
April 16, 1984 Judge Waltzer appointed Drs. Krimerman and Wickett to examine Harper and determine his mental status.
1April 27, 1984 Drs. Wickett and Cox reported that Harper was not competent to proceed to trial or to assist in his defense and that at the time of the alleged offense Harper was psychotic and unable to distinguish right from wrong.
June 28, 1984 Judge Waltzer issued a judgment ordering that Harper be in the custody, care, and treatment of DHH to restore to competency.
January 23, 1985 Harper was admitted to FFF.
February 11, 1985 FFF admission assessment examination noted that Harper was fifty years old and served in the military as a cook. FFF dis *507 charge recommendation was that he be referred to the aftercare coordinator and participate in “family counseling through the parish mental health center.”
May 6,1985 FFF advised Judge Waltzer that Harper was competent to stand trial.
June 4, 1985 Judge Waltzer issued a writ of habeas corpus to have Harper brought to court for reexamination by physicians.
June 27, 1985 Judge Waltzer appointed Drs. Levy and Krimerman to examine Harper and determine competency to stand trial. Dr. Krimerman advised that when Harper is released he should regularly attend a mental health clinic, apply for disability benefits if he cannot secure employment, and find housing near his sister.
July 23,1985 Dr. Levy advised the court that Harper was competent to stand trial.
August 14, 1985 Bench trial was held before Judge Waltzer. Drs. Levy and Krimerman testified that Harper was competent to stand trial, but at the time the crime was committed Harper was unable to distinguish right from wrong. Harper was found NGRI. Harper was transferred to OPP following trial.
June 19, 1989 DHH’s June 19, 1989 letter notes that Harper is on the waiting list for FFF and that FFF was operating under a federal consent decree and must show that they are “expediting admissions as much as possible.”
June 28,1989 Harper’s attorney, Brenda Brown, filed Motion for ReAppointment of Sanity Commission and Petition and Order for Writ of Habeas Corpus Ad Testificandum which stated that Harper was at FFF. Drs. Cox and Krimerman were appointed and hearing was set by Judge Waltzer to determine if Harper could be released.
Is July 21, 1989 Hearing was held before Judge Waltzer. Harper’s attorney, Brenda Brown, appeared and waived presence of Harper. Dr. Krimerman testified that Harper is not dangerous to himself or others, not clearly psychotic but has the potential for this condition, and recommended that, if released, Harper attend a mental health center for at least one year so his condition can be observed. Criminal docket master stated that Harper’s attorney is to inform the Court as to the availability of a responsible person or relative.
August 11, 1989 Hearing was held before Judge Waltzer. Attorney Brown appeared and waived presence of Harper. Dr. Cox testified that Harper is not dangerous to himself or others, that Harper is a chronic schizophreni-ac, and that Harper would be in need of supervision.
Court found Harper not dangerous to himself or others and ordered Harper’s attorney “to attempt to secure a responsible relative or friend to supervise or be responsible for” Harper, and to contact Catholic Charities.
August 24, 1989 Judge Waltzer issued a judgment finding that Harper is not a danger to himself or others, ordered Harper’s release and ordered that DHH’s Orleans Inmate Treatment Service (“OITS”) find a halfway house for Harper and/or apply for welfare and social security.
August 25, 1989 OITS performs an assessment on Harper in response to the August 24, 1989 court judgment.
*508 September 25, 1989 Judge Waltzer indicated that' she would look into possible placement for Harper.
December 28, 1989 Hearing was held before Judge Waltzer. Harper was present and represented by Attorney John Ruskin. Drs. Cox and Guill-aume testified that Harper was not a danger to himself and/or others and recommended his release.
December 29, 1989 Judge Waltzer issued a judgment ordering Harper to be released and ordering Harper’s attorney to find suitable living arrangements for Harper.
March 5, 1990 Larry Turner, manager of OITS and employee of DHH, informed the court that DHH’s Region I, Division of Mental Health, Community Support Program, determined that Harper could not be placed in a group home because he “does not meet the criteria of being chronically mentally ill.”
| (March 20, 1990 Harper was transferred from OPP to FFF to facilitate Harper’s deinstitutionalization and conditional release.
March 23, 1990 FFF assessment report notes that Harper is to be “released back into society, preferably into a halfway house” and that he is to be “monitored by a community mental health center and become part of the . deinstitutionalization program” at FFF.
June 7, 1990 Judge Waltzer noted in the court’s minutes that Harper “is awaiting release.” Criminal docket master indicated that Harper’s file was closed.
May 18, 1992 U.S. Supreme Court rendered decision in Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).
June 19, 1992 FFF Review Panel recommended Harper'for probationary release with conditions of continued medication, drug screens, mental health follow up and living arrangements with family.
June 29, 1992 Letter was forwarded to Judge Morris Reed[5] enclosing the Review Panel report.
April 21,1994 FFF Review Panel opined that Harper did not present an unreasonable risk of harm to himself or others and should be transferred to a less restrictive civil hospital, such as ELSH. Reyiew Panel report and proposed order were sent to Judge Reed.
June 27, 1994 Judge Reed signed order transferring Harper from FFF to ELSH.
October 12, 1994 FFF received signed order transferring Harper to ELSH.
December 6, 1994 Harper was transferred to ELSH.
October 12, 1995 ELSH Review Panel found Harper in remission and not a danger to himself or others and recommended deinstitutionalization program.
February 16, 1996 Judge Reed signed order for deinstitutionalization program and allowed family excursion passes.
December 11, 1996 ELSH psychiatrists Drs. Riehoux and Graham sent correspondence to Judge Julian Parker notifying that Harper had completed deinstitutionalization program and *509 17recommending a contradictory hearing to consider conditional release.
January 21, 1997 Hearing was held before Judge Parker. Judge Parker ordered the release of Harper to his sister, Audrey Gabriel.
January 22, 1997 ELSH released Harper to live with sister. Harper is monitored by DHH’s Forensic Aftercare Clinic (“FAC”) for continued medication, drug screens, and mental health treatment.
May 16, 1997 Harper, through counsel, filed a Class Action Petition for Cer-tiorari and Damages alleging that his detention from the 1985 NGRI finding through his release in February 1997 was unconstitutional and. illegal because he was neither a danger to him- ■ self nor to others and should have been released upon his NGRI finding.
September 28, 1997 FAC recommended higher level of care through inpatient admission to St. Charles Parish Hospital on the basis of September 22, 1997 blood tests positive for cocaine and negative for antipsychotic medication.
September 25, 1997 Harper was arrested for conditional release violation.
October 22, 1997 Harper, through counsel, filed Emergency Application for Writ of Habeas Corpus.
October 28, 1997’ Rule to show cause hearing was held before Judge Charles Elloie.' Harper appeared and was represented by counsel. Probation was terminated.
October 29, 1997 Judge Elloie issued written order for unconditional discharge from Department of Corrections and Public Safety and DHH. Harper was released.
December 3, 1997 Judge Elloie recalled October 1997 order and issued new order but Harper remained unconditionally released.- •
November 14, 2003 Harper died due to liver cancer.'
December 5, 2003 Plaintiffs/Appellees filed a petition for damages,' asserting a survival action and wrongful death .action. .
February 17, 2006 Judge Carolyn Gill— Jefferson dismissed with ' prejudice DHH from the class action filed by Harper in 1997.
May 20, 2013 — Jury trial was held before Judge Nadine Ramsey; .
June 3, 2013

IsLiability of DHH

I disagree with the majority as to the standard of review in this case with respect to liability. I find that the trial court’s submission of confusing and misleading interrogatories to the jury affected the jury’s findings with respect to liability of DHH and constituted reversible legal error that triggers de novo review. I agree with the partial dissent of Judge Landrieu that the “jury was presented with a set of interrogatories that were both confusing, and inaccurate, ... did not follow, the proper duty/risk analysis ... and resulted in the jury returning answers that were inconsistent with each other and made it impossible for the trial court to ‘enter judgment in conformity with the jury’s answers to these special questions and according to applicable law.’ See, La. C.C.P. art 1812 D (emphasis supplied).”
In Banks v. Children’s Hospital, 13-1481, p. 13 (La.App. 4 Cir. 12/17/14), 156 So.3d 1263, 1272, this court stated:
Generally, a jury’s factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Dev., 617 *510 So.2d 880, 882 (La.1993). However, where, as here, legal error has interdicted the fact finding process, the manifest error standard no longer applies and, if the record is complete, the appellate court should make its own de novo review of the record. Evans v. Lungrin, 97-0541, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735; Lam v. State Farm Mut. Auto. Ins. Co., 05-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135; Ullah, Inc. v. Lafayette Ins. Co., 2009-1566, p. 17 (La.App. 4 Cir. 12/17/10), 54 So.3d 1193, 1203. Applying de novo review, the appellate court independently views the record, without granting any deference to the trial court’s findings, to determine the preponderance of the evidence. Ferrell, supra, 94-1252, p. 7, 650 So.2d at 747; Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163, 165 (1975). This court has previously held that the trial court’s submission to the jury of “a verdict sheet which either confuses or misleads the jury,” may constitute reversible legal error that triggers de novo review. Niklaus v. Bellina, 96-2411, p. 7 (La.App. 4 Cir. 5/21/97), 696 So.2d 120, 124. Where, however, the legal error does not affect all -the jury’s |afindings, the appellate court should confine its de novo review to only those findings that have been interdicted by the error. Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Lam, supra, 2005-1139, p. 3 (La.11/29/06), 946 So.2d at 135-36.
Accordingly, I reviewed the record de novo to determine whether the Plaintiffs/Appellees proved their case by a preponderance of the evidence that DHH was liable for their father’s wrongful confinement.
Plaintiffs’/Appellees’ claims against DHH sound in negligence and are subject to a duty/risk analysis. Under the duty/ risk analysis, the plaintiff must satisfy the following elements to prove negligence; the plaintiff must prove that: 1) the conduct in question was the cause-in-fact of the resulting harm, 2) the defendant owed a duty of care to the plaintiff, 3) the defendant breached that requisite duty and 4) the risk of harm was within the scope of protection afforded by the duty breached. Faulkner v. McCarty Corp., 2002-1337, p. 4 (La.App. 4 Cir. 6/11/03), 853 So.2d 24, 28 (citing Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585).
The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law. Hanks v. Entergy Corp., 2006-477 (La.12/18/06), 944 So.2d 564, 579. Governmental agencies may be subjected to the imposition of duties by legislation, ordinance or rule of law, the breach of which may result in liability for damages to those injured by a risk contemplated by that duty. Cormier v. T.H.E. Ins., Co., 98-2208, p. 7 (La.9/8/99), 745 So.2d 1, 8. The court’s role is to determine whether there is any jurisprudential or statutory rule, or policy reason why, under the facts and circumstances of the case, the state would owe a duty to compensate plaintiff for his injuries. Id.
I find that DHH had a duty to follow the orders of the Criminal Court and to secure appropriate housing for Harper to facilitate his deinstitutionalization and | inrelease.[6] DHH breached this duty by failing to promptly obtain suitable living arrangements for Harper and by failing to use whatever reasonable measures necessary to facilitate Harper’s expedited deinstitutionalization. I find that DHH’s *511 actions and/or inactions were the sole cause for Harper’s confinement for over seven (7) years after Harper was found not dangerous to himself or the community.
I find that Judge Waltzer’s August 24, 1989 and December 29, 1989 judgments read in conjunction with La.C.Cr.P. art. 654 released Harper from confinement and gave DHH specific instructions to find suitable living arrangements for Harper in a reasonable period of time. After Judge Waltzer found that Harper was not a danger to himself or to others, La.C.Cr.P. art. 654 provided the court with two options with respect to his release: (1) order Harper’s discharge or (2) order Harper’s “release on probation subject to specified conditions for a fixed or indeterminate period.” Art. 654 further states that the court shall assign “written findings of fact and conclusions of law; however, the assignment of reasons shall not delay the implementation of judgment.” La.C.Cr.P art. 654 (emphasis added).[7]
DHH was solely responsible for fulfilling the condition of release and was in the unique position to accomplish this task. The record reflects Judge Waltzer’s concern that she did not want Harper to be “tossed out” onto the street. At the trial of this lawsuit, Judge Waltzer testified that she “was frightened that he would be just lying on the street” or “found on the street totally, you know, bereft of all Inhumanity ...” According to Judge Waltzer’s testimony, DHH should have fulfilled this condition within a couple of months.
The Louisiana legislature has declared by statute that the public policy in treating a patient in a state mental hospital shall be, in pertinent part:
(2) That any involuntary treatment or evaluation be accomplished in a setting which is medically appropriate, most likely to facilitate proper care and treatment that will return the patient to the community as soon as possible, and is the least restrictive of the patient’s liberty.
[[Image here]]
(5) That individual rights of patients be safeguarded.
La. R.S. 28:50 (emphasis added).[8]
In Davis v. Puryear, 95-1637, p. 17 (La.App. 4 Cir. 5/1/96), 673 So.2d 1298, 1307, this court stated:
*512 But the purposes of committing a person to a mental health hospital are wholly different from.incarceration in a jail or a prison. Admission to a mental health hospital in general is, of course, usually for the purpose of treatment.
When a person is or should be committed to a mental hospital because the person is a danger to others, then the very purpose of the actual or needed commitment is the prevention of harm to others .... the purposes of commitment to a mental health hospital: to care for the committed person and to prevent the committed person from hurting himself or herself or others.
In Jones v. Gaines, 43,049, p. 11 (La.App. 2 Cir. 3/5/08), 978 So.2d 522, 528, the court noted:
The Louisiana legislature defined the policy of the Mental Health Law indicating that the facility is to provide care to the mental patient in the least restrictive manner possible and protect the patient’s rights ... There is an interest in detaining dangerous persons, but the statute indicates that the facility has a duty to the mentally ill to protect their rights and liberties. Though the rights of the patient and the protection of the public present a competing interest in some cases, the mental health facility’s duty should be first to the patient to ensure proper treatment and proper confinement periods. Because the patient in many circumstances cannot speak for himself-and surrenders himself to the mental health facility and his care provider, the facility is often in the unique position of providing the only protection available to the patient ...
Louisiana law provides for the confinement of an insanity acquittee on the theory that proper therapeutic treatment in custody, together with effective deinstitutionali-zation and .aftercare treatment, will provide for the safety of the insanity acquittee and the community. Confinement of Harper would be justified only if Harper had received proper services at FFF and effective aftercare treatment and deinstitution-alization program. To find otherwise would in effect allow for the indeterminate commitment and confinement of an insanity acquittee because DHH-cannot fulfill its duty pursuant to court orders and/or pursuant to its statutory duties- as the state mental health entity to “provide health and medical services for the uninsured and medically indigent citizens of Louisiana” and services for persons with mental illness.[9]
I agree with the other panel members that Judge Waltzer’s orders to release Harper placed a condition on his release and that the condition was not met. I part ways in that I find DHH had the duty to fulfill that condition of release in a reasonable period of time and breached that duty causing Harper to be wrongfully 11sconfined from at least March 20, 1990 until his release to his sister on January 22,1997.
I further find Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) instructive in this matter., In Fou-cha, the U.S. -Supreme Court found that continued confinement of an insanity ac-quittee, after the hospital review committee had reported no evidence of mental illness, and recommended conditional discharge, violated due process. The Court explained:
We held, however, that “(t)he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous,” [citation omitted]’; i.e., the acquittee may be held as long as he is *513 both mentally ill and dangerous, but no longer. We relied on O’Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), which held as a matter of due process that it was. unconstitutional for a State to continue to confine a harmless, mentally .ill person. Even if the initial commitment was permissible, “it could not constitutionally continue after that basis no longer existed.” Id., at 575, 95 S.Ct., at 2493. In the summary of our holdings in our opinion we stated that “the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society.” Jones, 463 U.S., at 368, 370, 103 S.Ct., at 3052, 3053. The court below was in error in characterizing the above language from Jones as merely an interpretation of the pertinent statutory law in the District of Columbia and as having no constitutional significance. In this case, Louisiana does not contend that . Foucha was mentally ill at the time of the trial court’s hearing. Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis. O’Connor, supra, 422 U.S., at 574-575, 95 S.Ct., at 2493-2494.
Here, Judge Waltzer found in her 1989 orders of release that Harper was not dangerous to himself or others and that he should be released. In fact, Harper was never found to be dangerous at any time. I find Foucha definitively required the immediate release of Harper. DHH’s argument that it was unable to facilitate- the | uprompt deinstitutionalization of Harper is without merit.[10] DHH failed to use reasonable care to seek suitable living arrangements for Harper and to secure his release from confinement.
In summary,' the Plaintiffs/Appellees met their burden under a duty/risk analysis. For the reasons discussed herein, I find DHH liable for the negligent wrongful confinement of Harper.

Damages

I do not find that legal error affected the jury’s findings concerning the amount of damages awarded to the Plaintiffs/Ap-pellees in the amount of $1.5 million for the wrongful detention of Harper and in the amount of $275,000.00 to each Plaintiff/Appellee for loss of consortium- under La. C.C. art 2315. Thus, I will review the jury’s factual findings as to damages under a manifest error or clearly wrong standard of review. See Banks, 2013-1481, pp. 12-13, 156 So.3d at 1272 (“Generally, a jury’s factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong ... Where, however, the legal error does not affect all the jury’s findings, the appellate court should confine its de novo review to only those findings that have been interdicted by the error [citations omitted]”).
In Norfleet v. Lifeguard Transp. Ser., Inc., 2005-0501, pp. 4-5 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 851-52, this court stated:
*514 Appellate courts review factual findings of the trial court or jury using the “manifest error” or “clearly wrong” standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Louisiana Supreme Court developed a two-part test for reviewing and reversing the factfinder’s | ^determinations. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). This bifurcated test states: 1) the reviewing court must find that the trial court’s findings have no reasonable factual basis and 2) the record shows that the findings are wrong (manifestly erroneous). Mart, 505 So.2d at 1127. The reviewing court must view the record in its totality to determine if the factfinder was clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). The appellate court must determine if the factfinder’s decision was a reasonable one. Id. This rationale stems from the fact that the trial court has “better capacity to evaluate live witnesses.” Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). “[Wjhere two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.” Stobart, 617 So.2d at 883. The majority of the issues presented in the case sub judice are factual questions and will be reviewed using the above standard.
As discussed herein, I find that Harper was wrongfully confined in DHH custody from March 20, 1990 to January 22, 1997, and accordingly, that a jury award of damages attributed prior to 1990 is manifest error. Giving due deference to the jury’s factual findings as to damages, I would reduce the jury award for wrongful confinement to $900,000.00.
I disagree with the majority’s holding that the Plaintiffs/Appellees failed to establish that they suffered any loss of consortium. In Turner v. Lyons, 03-0186, p. 12 (La.App. 4 Cir. 1/28/04), 867 So.2d 13, 21-22, this court stated:
A loss of consortium award is a fact-specific determination, to be decided case-by-case and is disturbed only if there is a clear showing of an abuse of discretion. Rudd v. Atlas Processing Refinery, 26,048 (La.App. 2 Cir. 9/21/94), 644 So.2d 402, 411; Johnson v. Wal-Mart Stores, Inc., 616 So.2d 817 (La.App. 2nd Cir.1993). If an abuse of discretion is found, it is incumbent upon this court to determine the greatest or least amount that the fact finder could have reasonably awarded, and either raise or lower the award to that extent. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
However, before a trial court award of damages can be questioned as excessive or inadequate, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant case. Coco v. Winston Industries, Incorporated, 341 So.2d 332 (La.1977). Thus we must examine the facts of this case and, in particular, the circumstances of the relationship of each child with the decedent. Emphasis added. Watkins v. Bethley, 662 So.2d 839 (La.App. 2 Cir. 11/1/95). In Thonn v. Cook, 2003-0763 (La.App. 4 Cir. 12/10/03), 863 So.2d 628, the Fourth Circuit, held:
Loss of consortium claims generally have the following seven items: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance or material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Campbell v. Webster Parish Police Jury, 36,391 (La.App. 2 Cir. 09/18/02), 828 So.2d 170.
To be compensable, it is not necessary that a loss of consortium claim include *515 damages from each category. Gunn v. Robertson, 01-347 (La.App. 5 Cir. 11/14/01), 801 So.2d 555, 565; Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700. However, the plaintiff has the burden of proving definite loss. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App. 2 Cir. 12/6/00), 774 So.2d 1093. Although claims for consortium are usually made by minor children, La. C.C. articles 2315, 2315.1 and 2315.2 offer relief without regard to the majority or minority of the parties so aggrieved. Moreover, precedent exists for the award of loss of consortium to adult children. Sebastien, et al. v. McKay, M.D., et al., 94-203 (La.App. 3 Cir. 11/23/94), 649 So.2d 711.
The majority cites to an estrangement between Harper and his children throughout the period surrounding his incarceration and commitment as a basis for precluding damages for loss of consortium. I cannot agree. The trial testimony reveals that Sharon and Michael Harper were 22 and 16 years old, respectivély, at the time of Harper’s arrest in 1984. Neither of the children knew their father’s whereabouts following the arrest until 1994 or 1995 when Sharon learned that Harper was in FFF. Both Sharon and Michael Harper resumed communication with their father thereafter. Considering that this litigation arises from an insanity acquittee’s confinement, I cannot overlook the connection between the | ^confinement ánd the estrangement from family; thus, I part ways with the majority on this issue.
Nevertheless, as Harper did not provide any significant financial support to Plaintiffs/Appellees, I find that the jury erred in awarding $275,000.00 to each Plaintiff/Ap-pellee for loss of consortium. The Louisiana Supreme Court has held that, where manifest error is found, it is incumbent upon this court to determine the greatest or least amount that the fact finder could have reasonably awarded, and either raise or lower the award to that extent. See Youn, 623 So.2d at 1260. Accordingly, I would reduce the jury awards to each Plaintiff/Appellee for loss of consortium from $275,000.00 to $25,000.00. Compare Turner, supra, with Rivet v. State, Through Department of Transportation, 434 So.2d 436 (La.App. 3 Cir.1983); Estate of King v. Aetna Cas. Surety Co., 427 So.2d 902 (La.App. 3 Cir.1983); LeJeune v. Allstate, Ins. Co., 373 So.2d 212 (La.App. 3 Cir.1979); Brodtmann v. Duke, 96-0257 (La.App. 4 Cir. 2/11/98), 708 So.2d 447.
While I would not further reduce the jury award for any comparative fault, I reiterate that I concur with the majority that the statutory cap set forth in La. R.S. 13:5106 applies. Thus, by operation of the statutory cap, I would limit the Plaintiffs’/Appellees’ damage award to $500,000.00.

. Harper was arrested pursuant to La. R.S. 14:67 for the theft of aluminum pressure bars valued at $4,200.00.

. Feliciana Forensic Facility is a Louisiana state mental health hospital, which was created pursuant to La. R.S. 28:25.1. FFF is a budgetary unit of DHH. See Op. Atty. Gen. No. 93-302, April 26, 1993. See also La. R.S. 28:21.

. The record shows that after Harper was found not guilty by reason of insanity, he was remanded to OPP. La.C.Cr.P. art. 654 provides, in part, "When a defendant is found not guilty by reason of insanity in any other felony case, the court shall remand him to the parish jail or to a private mental institution ...” Plaintiffs/Appellees maintain that Harper was in the legal custody of DHH during this time period; however, I find that Harper was in the legal custody of OPSO at OPP. "Legal custody of a prisoner can only be transferred by some type of court action.” Jacoby v. State, 434 So.2d 570, 574 (La.App. 1 Cir. 1983). Criminal Court did not have the authority at this time in the proceedings, after the August 14, 1985 trial, to place Harper in the legal custody of DHH and commit him to a state mental institution, such as FFF, without a finding that Harper was dangerous to himself or others. La.C.Cr.P. art. 654 provides, in part, "If the court determines that the defendant cannot be released without danger to others or to himself, it shall order him committed to a proper state mental institution or to a private mental institution ...” During this period, DHH, through Orleans Inmate Treatment Service, was providing care and treatment to Harper at OPP. According to the trial testimony of Larry Turner, mental health services to OPP inmates were provided by the Orleans Inmate Treatment Service, in accordance with the federal consent decree applicable during the relevant time period. See also La. R.S. 28:25.1(C)(1)(a)(ii); La. R.S. 28:25.1(C)(2)(b); Advocacy Center for the Elderly and Disabled v. DHH, 731 F.Supp.2d 603 (E.D.La.2010). I do not find any liability on the part of DHH during this time period when Harper was confined at OPP. Plaintiffs/Appellees failed to prove that DHH breached its duty to provide adequate and reasonable medical care and treatment to Harper or that any actions or inactions of DHH contributed to Harper being confined at OPP from August 14, 1985 to March 20, 1990.

. East Louisiana State Hospital is designated under Louisiana law as a hospital for persons with mental illness and addictive disorders. See La. R.S. 28:21.

. On the correspondence, Judge Waltzer’s name is crossed out, and Judge Morris Reed’s name is handwritten, as Judge Waltzer no longer presided over the division assigned to Harper’s criminal casé. .

. I do not find that these actions and/or inac-tions of DHH were policymaking or discre-tionaiy acts which would implicate the immunity provision set forth in La. R.S. 9:2798.1.

. La.C.Cr.P. art. 654 reads in pertinent part:
... If the court determines that the defendant can be discharged or released on probation without danger to others or to himself, the court shall either order his discharge, or order his release on probation subject to specified conditions for a fixed or an indeterminate period. The court shall assign written findings of fact and conclusions of law; however, the assignment of reasons shall not delay the implementation of judgment.

. The Mental Health Law in Chapter 1 of Louisiana Revised Statute Title 28 and other mental health' statutes set forth the required standard of care as to the treatment of mental health patients at FFF and ELSH and duties of DHH and its budgetary units, such as FFF and Metropolitan Human Service District ("MHSD”). See e.g. La. R.S. 28:171; La. R.S. 28:25.1(C)(1)(a)(ii); La. R.S. 28:206; La. R.S. 36:251; La. R.S. 36:254(A)(10); La. R.S. 40:2013; La. R.S. 36:254(I)(1)(providing that MHSD is responsible for the "operation and management of community-based mental health” in Orleans Parish); see also La. R.S. 28:206 (establishing a duty on DHH "to promote the establishment of a continuum of care to house emotionally and behaviorally disturbed children and adults. The continuum of care may include but not limited to group homes and supportive housing services, programs, and facilities.”). Title XXI of the Louisiana Code of Criminal Procedure sets forth the procedure by which a "person acquitted of a crime or misdemeanor by reason of insanity or mental defect may be committed ...” La. R.S. 28:59; La. R.S. 28:58; see also La.C.Cr.P. art. 658(B)(2) (providing for DHH’s duty to-provide for "community treatment and monitoring” of insanity acquittees released into the community).

. La. R.S. 36:251; see footnote 7.

. The United States Supreme Court in O’Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) found that a patient involuntarily committed to a Florida state mental hospital for care, maintenance, and treatment cannot be confined by the state merely to ensure him “a living standard superior to that" which he had in the private community. The Court stated that “the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But ... while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising, the living standards of those capable of surviving safely in freedom ..."